**WILLIAMS v. McGOWAN, Collector of Internal Revenue.**

No. 81.

Circuit Court of Appeals, Second Circuit.

Dec. 20, 1945.

FRANK, Circuit Judge, dissenting in part.

Mandeville, Buck, Teeter & Harpending and Joseph W. Buck, all of Elmira, N. Y.,

and Charles Swan III, of New York City, for appellant.

Benjamin H. Pester, of Washington, D. C., Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and A. F. Prescott, Sp. Assts. to the Atty. Gen., and George L. Grobe, U. S. Atty., and Norman Kirchgraber, Asst. U. S. Atty., both of Buffalo, N. Y., for appellee.

Jacob J. Kaplan and Elden McFarland, both of Boston, Mass. (Nutter, McClennen & Fish and M. Ward Whalen, all of Boston, Mass., of counsel), amici curiae.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

■ This is an appeal from a judgment dismissing the complaint in an action by a taxpayer to recover income taxes paid for the year 1940. Of the two questions involved the first is whether $700 which the plaintiff paid to attorneys to secure the refund of his taxes paid for the years 1936 and 1937, was a proper deduction under § 23(a) (2) of the Internal Revenue Code as amended by § 121 of the Act of 1942, 26 U.S.C.A. Int.Rev.Code, § 23(a) (2). Since the judgment below was entered the Supreme Court has decided that such expenses are deductible. Trust of Bingham v. Commissioner, 325 U.S. 365, 65 S.Ct. 1232. It is true that that case, as its title implies, concerned a trust, but the Tax Court has held that this was not a controlling consideration (Cammack v. Commissioner, 5 T.C. 467); and even a casual reading of the Supreme Court's opinion shows that nothing turned upon the circumstance. We may therefore dispose of this question summarily, and proceed to the second, as to which the facts were as follows.

Williams, the taxpayer, and one, Reynolds, had for many years been engaged in the hardware business in the City of Corning, New York. On the 20th of January, 1926, they formed a partnership, of which Williams was entitled to two-thirds of the profits, and Reynolds, one-third. They agreed that on February 1, 1925, the capital invested in the business had been $118,082.05, of which Reynolds had a credit of $29,029.03, and Williams, the balance— $89,053.02. At the end of every business year, on February 1st, Reynolds was to pay to Williams, interest upon the amount of the difference between his share of the

capital and one-third of the total as shown by the inventory; and upon withdrawal of one party the other was to have the privilege of buying the other's interest as it appeared on the books. The business was carried on through the firm's fiscal year, ending January 31, 1940, in accordance with this agreement, and thereafter until Reynolds' death on July 18th of that year. Williams settled with Reynolds' executrix on September 6th in an agreement by which he promised to pay her $12,187.90, and to assume all liabilities of the business; and he did pay her $2,187.98 in cash at once, and $10,000 on the 10th of the following October. On September 17th of the same year, Williams sold the business as a whole to the Corning Building Company for $63,926.28—its agreed value as of February 1, 1940—"plus an amount to be computed by multiplying the gross sales of the business from the first day of February, 1940 to the 28th day of September, 1940," by an agreed fraction. This value was made up of cash of about $8100, receivables of about $7000, fixtures of about $800, and a merchandise inventory of about $49,000, less some $1000 for bills payable. To this was added about $6,000 credited to Williams for profits under the language just quoted, making a total of nearly $70,000. Upon this sale Williams suffered a loss upon his original two-thirds of the business, but he made a small gain upon the one-third which he had bought from Reynolds' executrix; and in his income tax return he entered both as items of "ordinary income," and not as transactions in "capital assets." This the Commissioner disallowed and recomputed the tax accordingly; Williams paid the deficiency and sued to recover it in this action. The only question is whether the business was "capital assets" under § 117 (a) (1) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 117(a) (1).

■ It has been held that a partner's interest in a going firm is for tax purposes to be regarded as a "capital asset." Stilgenbaur v. United States, 9 Cir., 115 F. 2d 283; Commissioner v. Shapiro, 6 Cir., 125 F.2d 532, 144 A.L.R. 349. We too accepted the doctrine in McClellan v. Commissioner, 2 Cir., 117 F.2d 988, although we had held the opposite in Helvering v. Smith, 2 Cir., 90 F.2d 590, 591, where the partnership articles had provided that a retiring partner should receive as his share only his percentage of the sums "actually

572

collected" and "of all earnings * * * for services performed." Such a payment, we thought, was income; and we expressly repudiated the notion that the Uniform Partnership Act had, generally speaking, changed the firm into a juristic entity. See also Doyle v. Commissioner, 4 Cir., 102 F. 2d 86. If a partner's interest in a going firm is "capital assets" perhaps a dead partner's interest is the same. New York Partnership Law §§ 61, 62(4), Consol.Laws N.Y. c. 39. We need not say. When Williams bought out Reynolds' interest, he became the sole owner of the business, the firm had ended upon any theory, and the situation for tax purposes was no other than if Reynolds had never been a partner at all, except that to the extent of one-third of the "amount realized" on Williams' sale to the Corning Company, his "basis" was different. The judge thought that, because upon that sale both parties fixed the price at the liquidation value of the business while Reynolds was alive, "plus" its estimated earnings thereafter, it was as though Williams had sold his interest in the firm during its existence. But the method by which the parties agreed upon the price was irrelevant to the computation of Williams' income. The Treasury, if that served its interest, need not heed any fiction which the parties found it convenient to adopt; nor need Williams do the same in his dealings with the Treasury. We have to decide only whether upon the sale of a going business it is to be comminuted into its fragments, and these are to be separately matched against the definition in § 117(a) (1), or whether the whole business is to be treated as if it were a single piece of property.

■ Our law has been sparing in the creation of juristic entities; it has never, for example, taken over the Roman "universitas facti";[1] and indeed for many years it fumbled uncertainly with the concept of a corporation.[2] One might have supposed that partnership would have been an especially promising field in which to raise up an entity, particularly since merchants have always kept their accounts upon that basis. Yet there too our law resisted at the price of great and continuing confusion; and, even when it might be thought that a statute admitted, if it did not demand, recognition of the firm as an entity, the old concepts prevailed. Francis v. McNeal, 228 U.S. 695, 33 S.Ct. 701, 57 L.Ed. 1029, L.R.A.1915E, 706. And so, even though we might agree that under the influence of the Uniform Partnership Act a partner's interest in the firm should be treated as indivisible, and for that reason a "capital asset" within § 117(a) (1), we should be chary about extending further so exotic a jural concept. Be that as it may, in this instance the section itself furnishes the answer. It starts in the broadest way by declaring that all "property" is "capital assets," and then makes three exceptions. The first is "stock in trade * * * or other property of a kind which would properly be included in the inventory"; next comes "property held * * * primarily for sale to customers"; and finally, property "used in the trade or business of a character which is subject to * * * allowance for depreciation." In the face of this language, although it may be true that a "stock in trade," taken by itself, should be treated as a "universitas facti," by no possibility can a whole business be so treated; and the same is true as to any property within the other exceptions. Congress plainly did mean to comminute the elements of a business; plainly it did not regard the whole as "capital assets."

■ As has already appeared, Williams transferred to the Corning Company "cash," "receivables," "fixtures" and a "merchandise inventory." "Fixtures" are not capital because they are subject to a depreciation allowance; the inventory, as we have just seen, is expressly excluded. So far as appears, no allowance was made for "good-will"; but, even if there had been, we held in Haberle Crystal Springs Brewing Company v. Clarke, Collector, 2 Cir., 30 F.2d 219, that "good-will" was a depreciable intangible. It is true that the Supreme Court reversed that judgment— 280 U.S. 384, 50 S.Ct. 155, 74 L.Ed. 498— but it based its decision only upon the fact that there could be no allowance for the depreciation of "good-will" in a brewery, a business condemned by the Eighteenth Amendment. There can of course be no gain or loss in the transfer of cash; and,

[1] "By universitas facti is meant a number of things of the same kind which are regarded as a whole; e. g. a herd, a stock of wares." Mackeldey, Roman Law § 162.

[2] "To the 'church' modern law owes its conception of a juristic person, and the clear line that it draws between 'the corporation aggregate' and the sum of its members." Pollack & Maitland, Vol. 1, p. 489.

although Williams does appear to have made a gain of $1072.71 upon the "receivables," the point has not been argued that they are not subject to a depreciation allowance. That we leave open for decision by the district court, if the parties cannot agree. The gain or loss upon every other item should be computed as an item in ordinary income.

Judgment reversed.

FRANK, Circuit Judge (dissenting in part).

I agree that it is irrelevant that the business was once owned by a partnership. For when the sale to the Corning Company occurred, the partnership was dead, had become merely a memory, a ghost. To say that the sale was of the partnership's assets would, then, be to indulge in animism.

But I do not agree that we should ignore what the parties to the sale, Williams and the Corning Company, actually did. They did not arrange for a transfer to the buyer, as if in separate bundles, of the several ingredients of the business. They contracted for the sale of the entire business as a going concern. Here is what they said in their agreement: "The party of the first part agrees to sell and the party of the second part agrees to buy, *all of the right, title and interest* of the said party of the first part *in and to the hardware business* now being conducted by the said party of the first part, *including* cash on hand and on deposit in the First National Bank & Trust Company of Corning in the A. F. Williams Hardware Store account, in accounts receivable, bills receivable, notes receivable, merchandise and fixtures, including two G. M. trucks, good will and all other assets of every kind and description used in and about said business.[1] * * * Said party of the first part agrees not to engage in the hardware business within a radius of twenty-five miles from the City of Corning, New York, for a period of ten years from the 1st day of October 1940."

To carve up this transaction into distinct sales—of cash, receivables, fixtures, trucks, merchandise, and good will—is to do violence to the realities. I do not think Congress intended any such artificial result. In the Senate Committee Report on the 1942 amendment to § 117, it was said: "It is believed that this Senate amendment will be of material benefit to businesses which, due to depressed conditions, have been compelled to dispose of their plant or equipment at a loss. The bill defines property used in a trade or business as property used in the trade or business of a character which is subject to the allowance for depreciation, and real property held for more than six months which is not properly includible in the inventory of the taxpayer if on hand at the close of the taxable year or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. If a newspaper purchased the plant and equipment of a rival newspaper and later sold such plant and equipment at a loss, such plant and equipment, being subject to depreciation, would constitute property used in the trade or business within the meaning of this section." These remarks show that what Congress contemplated was not the sale of a going business but of its dismembered parts. Where a business is sold as a unit, the whole is greater than its parts. Businessmen so recognize; so, too, I think, did Congress. Interpretation of our complicated tax statutes is seldom aided by saying that taxation is an eminently practical matter (or the like). But this is one instance where, it seems to me, the practical aspects of the matter should guide our guess as to what Congress meant. I believe Congress had those aspects in mind and was not thinking of the nice distinctions between Roman and Anglo-American legal theories about legal entities.

---

[1] Emphasis added.