ANDREW A. MONAGHAN AND ETHEL MONAGHAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 90107. Filed June 27, 1963.

*William P. Thorn,* for the petitioner.

*Samuel T. Reiner* and *Max J. Hamburger,* for the respondent.

FORRESTER, *Judge:* The respondent has determined a deficiency of $31,199.74 in petitioners' income tax for the calendar year 1958. The sole remaining issues are: (1) The separate value, if any, of a covenant

not to compete; and (2) the propriety of petitioners reporting under section 453 [1] gain from the sale of certain assets of a going proprietorship package goods liquor business.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners were husband and wife and resided in Island Heights, N.J., at all times material hereto. They filed a joint cash basis income tax return for the calendar year 1958 with the district director of internal revenue at Camden, N.J.

Petitioners had been operating a going proprietorship retail package goods liquor store for approximately 6 years, when, in 1957, petitioner husband (hereinafter called petitioner) had an illness which was then undiagnosed and for which physicians advised rest. Petitioners listed the business for sale in 1957, with a broker, for $150,000, plus an amount equal to the cost of inventory.

On the morning of Saturday, January 25, 1958, petitioner met with his attorney and a party who wanted to buy the business. During the afternoon of said date, petitioner was approached by one Raymond Kramer (hereinafter sometimes called Raymond) relative to the sale of the business. Raymond stated that he had heard that the business was for sale for $150,000 plus an amount equal to the cost of the inventory, and that he knew of an interested party. Petitioner stated that he thought the business had been sold, but Raymond argued that it was still open for sale since a contract had not been signed and a deposit had not been left. Thereupon, Raymond called his brother, Louis Kramer (hereinafter sometimes called Louis), and told him that the business was about to be sold on Monday and suggested that Louis meet with petitioners on Sunday, the next day.

The next morning, Sunday, January 26, 1958, Raymond, Louis, and Louis' wife met with petitioner to discuss the sale of the business. Petitioner stated that any agreement would have to be signed immediately since another party was ready to purchase the business on the next day. After discussion, Louis agreed to purchase the business. Later that day, Louis telephoned his accountant William T. Athey (hereinafter called Athey), a former internal revenue agent. Said accountant advised that Louis should request that a covenant not to compete with an assigned value be included in the contract of sale.

On the next day, Monday, January 27, 1958, petitioner, his attorney, Raymond, Louis, and an attorney representing the Kramers met together in the office of the petitioners' attorney. Louis gave a check for $5,000 as a deposit. In their presence, petitioners' attorney orally dictated an agreement, and the parties agreed to each paragraph as

---

[1] Unless otherwise noted, all references are to the Internal Revenue Code of 1954.

dictated. The purchasers requested a covenant not to compete. Such a covenant was customary in the sale of package goods liquor stores. Petitioner willingly agreed to such a covenant, as he was ill, tired, and had no children. He even stated that he would be amenable to a 15-year covenant which would include the entire State of New Jersey, but he was advised that so broad a covenant was not desired and would not be legally binding. A covenant for 5 years which encompassed only Ocean County, N.J., was therefore agreed upon. This was the first discussion regarding such a covenant between the parties to the contract. The buyers did not request an allocation of part of the consideration to said covenant, and no such allocation was mentioned or agreed to at that time. This was so even though Athey, the day prior, had advised Louis to ask for an assigned value.

The written agreement, dated January 27, 1958, by which the petitioners agreed to sell their entire retail destribution liquor business and certain other assets to Raymond or his assignee provided in part:

1. The parties of the first part agree to sell and convey unto the party of the second part or his assignee, the following:

(a) a tract of land * * * and the improvements thereon;

(b) a Plenary Retail Distribution liquor business and incidental personal property, including cigarettes, soft drinks, and other details and items or personal property now being used in the conduction of said business on said premises, including the transfer to the party of the second part, or his assignee, of Plenary Retail Distribution Liquor License No. D3 issued by the Governing Body of the Township of Dover aforesaid, and presently in force and effect in said premises, for a total consideration of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00), to be paid as follows:

(a) $5,000.00 in cash, or its equivalent upon the execution and delivery of this Agreement, the receipt of which is hereby acknowledged;

(b) $38,500.00 in cash or its equivalent at settlement, which shall be at the law offices of Camp & Simmons, * * * Toms River, New Jersey, on or before March 27, 1958, at 11 o'clock in the forenoon; time is hereby made of the essence of this Agreement;

(c) $106,500.00 to be secured by a real estate mortgage and a chattel mortgage on the fixtures and equipment, * * *.

*　　*　　*　　*　　*　　*　　*

3. The closing papers between the parties shall contain ample provisions to provide for the agreement now made between the parties that the parties of the first part and neither of them shall engage directly or indirectly either as owner, operator or employee in any business or establishment selling intoxicating liquors, at retail, in any from [sic] in Ocean County for a period of five (5) years.

*　　*　　*　　*　　*　　*　　*

7. Suitable arrangements shall be made in the closing papers so that the said liquor license shall not be transferred from said premises unless consented to in writing by the parties of the first part or until the total amount due them has been paid off, since the parties recognize that the liquor license is

one of the main assets being sold hereunder. To that end, the party of the second part hereby agrees that he and his associates will form a legal corporation under the Laws of the State of New Jersey and have the said liquor license transferred and placed in the name of said corporation. After the said corporation has been so formed and organized, and simultaneously with the transfer of the liquor license to the corporation, the stock in said corporation shall be transferred to and delivered to and retained by the parties of the first part to effect their protection that the license will not be transferred. The said assignment of stock to the parties of the first part herein shall incorporate the purposes of said assignment in order that the parties of the first part, who will be the assignees of said stock, cannot transfer same for their own purposes.

\* \* \* \* \* \* \*

8. The parties of the first part represent and warrant to the party of the second part, or his assignee, as follows:

(a) the Federal Income Tax returns for the years set forth below have shown and reflected the following purchases and sales from the conduct of Monaghan Liquor Store:

|       | Gross sales | Purchases |
|-------|-------------|-----------|
| 1955  | $179,500    | $144,418  |
| 1956  | 178,750     | 145,623   |
| 1957  | 200,750     | 151,883   |

Although the agreement did not specifically refer to the disposition of the inventory, there was a concurrent, oral understanding that all inventory remaining at the time of closing was to be purchased at cost price. Petitioner agreed that the inventory so remaining would not exceed the cost of $25,000.

On February 24, 1958, Louis contacted Athey and asked him to call one Robert W. Sleezer (hereinafter called Sleezer), the accountant for the petitioners. Sleezer had been hired by petitioners after the January 27 contract of sale had been entered into. Athey called Sleezer on February 26 and the two accountants proceeded to attempt to arrange the tax results of the transaction. In reply to a request by Athey, Sleezer sent the following letter, dated February 27, 1958:

Mr. William Athey, C.P.A.

\* \* \*

\* \* \*

Dear Sir:

In reply to your request for information concerning our proposal on the sale of Managhan's [sic] Liquor Store please be advised as follows.

We would like to have a separate agreement or conveyance for both the inventory and the agreement not to compete with a stated value for each. The payment for the agreement not to compete to be spread equally over the five year period.

The agreement to convey the remaining business assets should allocate the remaining sales price to the various assets. In regard to this, I have gone

over the various items to be sold with Mr. Monaghan and have arrived at the following price allocations:

| | |
|---|---:|
| Land | $10,000.00 |
| Business building | 25,000.00 |
| Residence (which is attached to the business building) | 15,000.00 |
| Equipment | 10,000.00 |
| License | 25,000.00 |
| Goodwill | 55,000.00 |
| Total | $140,000.00 |

We have allocated $10,000.00 to the agreement not to compete in order to arrive at the agreed sales price of $150,000.00.

The agreement to convey the remaining business assets would not allow payment in this year in excess of 30% of the total sales price of $140,000.00.

I believe that the above information is that which you requested. We shall be pleased [to] furnish, upon Mr. Monaghan's approval, any additional information you may desire concerning our proposals.

Very truly yours,

\* \* \*

/s/ Robert W. Sleezer
Robert W. Sleezer

The settlement occurred on March 4, 1958. The Kramers had organized a corporation named Monaghan's of Ocean County, Inc., to which the assets were transferred. A statement of settlement provided in part:

| | | |
|---|---:|---:|
| Agreed Purchase Price | | $150,000.00 |
| Fire Insurance: | | |
| (a) Aetna Insurance Company Policy in amount of $7,500.00—2/26/58 to 2/26/63—total premium paid $83.62 | | 80.12 |
| (b) Milwaukee Insurance Company Policy in amount of $17,500.00—9/9/57 to 9/9/58 premium paid in amount of $205.98 | | 111.54 |
| (c) Commonwealth Insurance Company Policy in amount of $15,000.00—9/12/54 to 9/12/59—total premium paid $175.15 | | 94.77 |
| Comprehensive Policy with Aetna Insurance Company (CVA) 5/20/57 to 5/20/60—Total premium paid $41.90 | | 30.75 |
| Taxes; Unused part of 1st ½ 1958 taxes paid on real estate and personal property—1st ½ assessment of $177.00 paid | | 118.00 |
| | | $150,435.18 |
| Cash paid on account | 5,000.00 | |
| Purchase Money Mortgage supplemented by Chattel Mortgage in the principal sum of | 106,500.00 | |
| Payment of Cash at Settlement | 38,935.18 | |
| | | $150,435.18 |

An additional agreement, dated March 4, 1958, regarding inventory was entered into between petitioners and Raymond which stated:

WHEREAS, the parties to the within Agreement agree to purchase a certain tract of land and liquor business in the Township of Dover on January 27, 1958; and

WHEREAS, it is apparent that the purchasers will require a stock in trade of alcoholic beverages in related products in order to promptly and efficiently conduct said business;

NOW, THEREFORE, BE IT AGREED AND UNDERSTOOD between ANDREW A. MONAGHAN and ETHEL MONAGHAN, his wife, of * * * Ocean County, New Jersey, —and— RAY KRAMER, of * * * Monmouth County, New Jersey, as follows:

The stock in trade in said business shall be purchased by the party of the second part, or his assignee, at cost to the parties of the first part, and said stock shall be paid for by the party of the second part, or his assignee, to the parties of the first part, at settlement. The amount of said stock shall approximate $21,000.00

A statement regarding the inventory was signed by petitioners and Monaghan's of Ocean County, Inc., by Raymond and Louis, secretary and president, respectively, which stated:

STOCK

All alcoholic beverages and spiritous liquors presently on the premises situate on the southeast corner of River Drive and Washington Street, in the Township of Dover, Ocean County, New Jersey, as well as all cigarettes, tobacco products, sodas, snacks, foods, confectioners' products and any and all other items or stock in trade contained on said premises_____ $21,051.69

INSURANCE:

Total premium—$276.70 _____ 253.70

Total amount due sellers for inventory above, plus adjustment____ $21,305.39

During the settlement, there was some discussion regarding an allocation of the purchase price to the various assets, including the covenant not to compete. No agreement on an allocation was reached, however, and neither the contract of sale nor the settlement statement includes any allocation of purchase price.

After the sale, it was discovered that petitioner had a bleeding ulcer. He underwent an operation for the removal of two-thirds of his stomach. After recuperating, his doctor advised that he return to work because the "let down" had been too drastic. Said doctor advised 1 year of work and then gradual tapering off. Petitioner followed the advice and returned to the liquor business in March 1959, outside the covenant area. He remained in this business for approximately 13 months, and then sold the business and went on a vacation. He is no longer in the liquor business.

#### ULTIMATE FINDINGS

Petitioners did not receive any separate payment for the relevant covenant not to compete.

Not more than 30 percent of the selling price of the noninventory assets was paid to petitioners in the taxable year of sale.

OPINION

*Issue I*

The petitioners sold all the assets of a going proprietorship, including transferable goodwill. See *Merle P. Brooks*, 36 T.C. 1128. In determining whether the covenant not to compete had a separate value, we must find the substance of the situation in the factual context presented. We must "look at the entire transaction to see what the parties bargained for." *Merle P. Brooks, supra* at 1135.

Viewing the record as a whole, we find that the parties did not treat the covenant as a separate and distinct item of value. The petitioners wished to sell their business for $150,000, plus dollar for dollar inventory. They listed it with a broker for that price. They were about to sell to another customer when the instant buyers agreed to pay $150,000 plus dollar for dollar for inventory. After an oral understanding had been arrived at, Louis consulted Athey, who advised him to ask for a covenant not to compete with an assigned value. The purchasers ignored the advice regarding an assigned value and merely asked for a covenant. Petitioners readily agreed, because petitioner was ill and did not intend to return to the same type of business. Indeed, petitioner offered the entire State of New Jersey as to area and 15 years as the term. The parties incorporated the existing covenant only because an attorney advised that such a broad covenant would be unenforceable. Such a covenant as was included was usual in this type of transaction. While there was some discussion by accountants of an allocation of value, we are obliged to find the substance of the transaction and are not bound by the dickerings of accountants whose motives might be somewhat different. Further, we cannot find from the record that petitioners' accountant was authorized to negotiate an allocation. No separate value for the covenant was ever agreed to, and none is incorporated in the sale agreement. The parties did not intend to allocate any part of the purchase price to the covenant not to compete, and we have found as a fact that the petitioners did not receive anything for the covenant as a separate item in the transaction. See *Merle P. Brooks, supra; Lee Ruwitch*, 22 T.C. 1053; *Ethyl M. Cox*, 17 T.C. 1287; *Aaron Michaels*, 12 T.C. 17. We find for the petitioners on this issue.

*Issue II*

Respondent has determined that the payments to petitioners in the year of taxable sale exceeded 30 percent of the "selling price," thereby

denying utilization of section 453(b).[2]  The parties agree that the relevant inventory was "property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year" and therefore excluded from the statutory privilege of the installment method of reporting.  They further agree that invocation of the section 453(b)(2)(A)(ii) 30-percent limitation depends upon whether the amount received for the inventory is includable in the relevent computations.

Respondent's principal argument in support of his determination is that the facts of this case indicate sale of an entire business, including the inventory, and that such sale cannot be fragmentized even though the parties had a separate agreement as to the inventory.

We do not agree with respondent.  The sale of a going business operated as a proprietorship has long been considered as a sale of the separate business assets for purposes of ascertaining whether profit results in capital gain or ordinary income.  *Williams* v. *McGowan*, 152 F. 2d 570 (C.A. 2) ; *Ernest A. Watson*, 15 T.C. 800, affd. 197 F. 2d 56, affd. 345 U.S. 544, rehearing denied 345 U.S. 1003; Rev. Rul. 55–79, 1955–1 CB. 370, and it seems to us that the same principles apply when the statutory provisions regarding installment sales are to be considered.

In the usual installment sale, allocation of a portion of the downpayment to specific assets is not required because the relevant percentage of "payment" to "selling price" is the same whether total assets are compared to gross price or specific assets are compared to an allocable portion of the gross price.  An allocation is material, however, when there is a sale of a going proprietorship with an explicit amount received for property excluded by the terms in parentheticals of section 453(b)(1)(B), such as in the instant case since only the payment for the business was to be made in installments, while the separate agreement for the remaining inventory provided for payment in cash.  In such cases it is our conclusion that the sale of inventory for a separate price will not be included in determining whether the 30-percent

---

[2] SEC. 453.  INSTALLMENT METHOD.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—(1) GENERAL RULE.— Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) * * * only if in the taxable year of the sale or other disposition—

*        *        *        *        *        *        *

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

limitation will prevent installment reporting for the sale of the other assets.

In an analogous situation, the Commissioner allowed a similar type of allocation. Rev. Rul. 57–434, 1957–2 C.B. 300. There a taxpayer sold a going business, including a liquor license, in a State which required minimum downpayments of 40 percent on sales of liquor licenses and related assets. The Commissioner ruled that the sale of a going business is regarded as the sale of the separate business assets, and that the "class of property" which required more than 30-percent downpayment could not be reported on the installment plan. Sigficantly, the Commissioner further ruled that use of the installment method of reporting was not precluded in reporting the payments with respect to the remainder of the property included in the sale.[3] See also *Lubken* v. *United States*, an unreported case (S.D. Cal. 1961, 8 A.F.T.R. 2d 5073, 61–2 U.S.T.C., par. 9537) ; Rev. Rul. 55–79, *supra; Williams* v. *McGowan, supra.*

*Lubken* v. *United States, supra,* involved the sale of the assets of a going ranch, including cattle, and is factually indistinguishable from the instant case. The Court held that the amount received for the sale of the cattle inventory was excluded from the 30-percent test computations. It further held that proceeds from the sale of the remainder of the assets of the going proprietorship could be reported on the installment method, stating:

Although a particular class of property or assets sold does not qualify for treatment under the installment method, the installment method may be used in reporting payments with respect to the remainder of the property included in the sale, provided the conditions of the statute on the use of such method are satisfied, which was done by plaintiffs. * * *

Moreover, the parties agree that "paragraph (1)" of section 453(b) excludes the relevant inventory from the privilege of installment reporting. The 30-percent test of section 453(b)(2)(A) is expressly limited to "paragraph (1)." Since the relevant inventory was ex-

---

[6] Relevant portions of this Rev. Rul. (pp. 301–302) read as follows :

In the case of an installment sale, allocation of the down payment ordinarily presents no problem, since it usually represents a fixed percentage of the selling price of all the assets included in the sale. However, the conditions of a particular case may require a separate allocation of the down payment. Thus in the instant case the state regulations, applicable to the sale of a liquor license and related assets, require a minimum down payment of 40 percent of the selling price. Since a sale of a going business must be "comminuted into its fragments" for Federal income tax purposes, the allocation of the down payment should conform to the local legal requirements to which the sale was subject. (See Aaron F. Williams v. McGowan, 152 Fed. 2d 570.)

Accordingly, it is held that where, under state law or regulations, a minimum down payment is required upon the sale of a particular class of property, and the down payment exceeds the maximum permitted by section 453(b) of the Internal Revenue Code of 1954, the sale thereof does not qualify for treatment under the installment method. However, the use of the installment method is not precluded in reporting the payments with respect to the remainder of the property included in the sale, provided the conditions of the statute on the use of such method are satisfied.

cluded from reporting under "paragraph (1)," and since the 30-percent test applies only to "paragraph (1)," we hold that the relevant inventory was excluded from the 30-percent limitation test. Proceeds from the sale of said inventory were reportable in the year of such sale and should not and do not affect proceeds which could be reported on the installment method.

Because of concessions and adjustments,

*Decision will be entered under Rule 50.*