*Decisions will be entered under Rule 50.*

CHICK M. FARHA AND LEENDA FARHA, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2358-70—2361-70. Filed June 26, 1972.

*Roy C. Lytle*, for the petitioners.
*Wm. O. Lynch*, for the respondent.

#### OPINION

FORRESTER, *Judge:* For the calendar year 1967 respondent has determined deficiencies in petitioners' income taxes of $24,282.31, $5,379.65, $5,475.06, and $21,900.23 in docket Nos. 2358-70, 2359-70, 2360-70, and 2361-70, respectively. Petitioners have conceded all but one of the

---

[1] Cases of the following petitioners are consolidated herewith: Fred M. Farha and Thelma Farha, docket No. 2359-70; Sue M. Farha, docket No. 2360-70; and Woodrow W. Farha and Dodie Ann Farha, docket No. 2361-70,

originally disputed issues. The only question for our decision is whether petitioners are entitled to installment sale treatment under section 453 [2] with respect to the gain they derived from their sale of the outstanding stock of their closely held corporation.

All of the facts have been stipulated. The stipulation and all exhibits attached thereto are incorporated herein by this reference.

Petitioners were all residents of Oklahoma City, Okla., at the time of the filing of their respective petitions herein. Petitioners in docket No. 2358-70, Chick M. Farha (hereinafter referred to as Chick) and Leenda Farha, are husband and wife and filed a joint Federal income tax return for the calendar year 1967 with the district director of internal revenue in Oklahoma City, Okla. Petitioners in docket No. 2359-70, Fred M. Farha (hereinafter referred to as Fred) and Thelma Farha, are husband and wife and filed a joint Federal income tax return for the calendar year 1967 with the district director of internal revenue in Oklahoma City, Okla. Petitioner in docket No. 2360-70, Sue M. Farha (hereinafter referred to as Sue), filed an individual Federal income tax return for the calendar year 1967 with the district director of internal revenue in Oklahoma City, Okla. Petitioners in docket No. 2361-70, Woodrow W. Farha (hereinafter referred to as Woodrow) and Dodie Ann Farha, are husband and wife and filed a joint Federal income tax return for the calendar year 1967 with the district director of internal revenue in Oklahoma City, Okla.

Leenda Farha, Thelma Farha, and Dodie Ann Farha are parties to this proceeding only by virtue of having filed joint returns with their respective husbands. Consequently, petitioners Chick, Fred, Sue, and Woodrow, who are siblings, are hereinafter collectively referred to as the Farhas or petitioners.

Hereford Heaven Brands, Inc. (hereinafter referred to as the corporation), was a corporation engaged in the buying, processing, and selling of various meat products and other food products of a similar nature. Prior to August 19, 1967, the ownership of the corporation's outstanding capital stock was as follows:

| Stockholder | Number of outstanding shares owned | Percentage of outstanding shares owned |
|---|---|---|
| Chick | 3,200 | 40 |
| Fred | 800 | 10 |
| Sue | 800 | 10 |
| Woodrow | 3,200 | 40 |
| Totals | 8,000 | 100 |

[2] Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954.

Hereford Heaven Brands Co. (hereinafter referred to as the partnership) was a partnership which owned the land and building on and in which the corporation carried on its business. The partnership also owned certain trademarks and trade names under which the corporation sold its products. Prior to August 19, 1967, the ownership interests in the partnership were as follows:

| Partner | Ownership interest |
|---|---|
| Chick | 43. 97% |
| Fred | 1. 07% |
| Sue | 10. 99% |
| Woodrow | 43. 97% |
| Total | 100. 00% |

The building which the partnership owned and which it rented to the corporation was used by the corporation as its manufacturing plant. The partnership had built the building according to plans and specifications which met the requirements of the U.S. Department of Agriculture. The U.S. Department of Agriculture licensed the plant for the interstate sale of the meat products processed therein, and without such specially designed building the corporation could not have sold its products interstate.

According to the partnership's Partnership Return of Income (Form 1065) for the taxable year 1967, the partnership's taxable year began April 1, 1967, and ended August 18, 1967.

On August 19, 1967, petitioners entered into three separate written agreements with Geo. A. Hormel & Co. (hereinafter referred to as Hormel).

The first agreement was entitled "Purchase Agreement," and provided in part as follows:

WHEREAS, HORMEL is desirous of acquiring all of the assets (with exceptions as hereinafter set forth) of HEREFORD HEAVEN BRANDS COMPANY, a copartnership composed of Woodrow W. Farha, Chick M. Farha, Sue M. Farha and Fred M. Farha, hereinafter referred to as "PARTNERSHIP", and

WHEREAS, PARTNERS are willing to sell to HORMEL all of the partnership assets (with exceptions as hereinafter set forth) on the terms and conditions hereinafter set forth.

The agreement then set forth certain representations and warranties. The gist of the agreement appeared as follows:

On the basis of the representations and warranties set forth in Part I hereof, and for the consideration and upon the conditions hereinafter set forth, the parties hereto agree that:

1. On the delivery date the PARTNERS will sell and deliver to HORMEL the above described assets, conveying the real property and the improvements thereon by a warranty deed accompanied by the requisite amount of documentary stamps to evidence payment of all transfer taxes required to be paid thereon,

by bills of sale, assignments, and other documents necessary or desirable to evidence the transfer of title to HORMEL.

2. That the purchase price of said assets as negotiated by the parties hereto is as follows:

(a) Land_____ $62,500.00
(b) Building _____ 360,000.00
(c) Building improvements, appurtenances, equipment, etc_____ 120,000.00
(d) Trademarks, trade name and good will_____ 312,500.00

Total _____ $855,000.00

3. That this contract does not contemplate any transfer to HORMEL of cash owned by the PARTNERSHIP, accounts receivable owned by the PARTNERSHIP or insurance policies owned by the PARTNERSHIP, although at HORMEL'S option HORMEL may acquire and have transferred to it any insurance now in force on the premises, paying therefor the prorated prepaid insurance premiums.

The agreement provided for payment of the sale price of $855,000 to petitioners as follows:

| Form of payment: | Payments to: | | | | Totals |
| --- | --- | --- | --- | --- | --- |
| | Chick | Fred | Sue | Woodrow | |
| Cash_____ | $32,977.50 | $802.50 | $8,242.50 | $32,977.50 | $75,000 |
| Note due 8/19/68_____ | 68,593.20 | 1,669.20 | 17,144.40 | 68,593.20 | 156,000 |
| Note due 8/19/69_____ | 68,593.20 | 1,669.20 | 17,144.40 | 68,593.20 | 156,000 |
| Note due 8/19/70_____ | 68,593.20 | 1,669.20 | 17,144.40 | 68,593.20 | 156,000 |
| Note due 8/19/71_____ | 68,593.20 | 1,669.20 | 17,144.40 | 68,593.20 | 156,000 |
| Note due 8/19/72_____ | 68,593.20 | 1,669.20 | 17,144.40 | 68,593.20 | 156,000 |
| Totals_____ | 375,943.50 | 9,148.50 | 93,964.50 | 375,943.50 | 855,000 |

On August 19, 1967, the Farhas received the cash and notes as provided under the first agreement and on that date they transferred the aforelisted partnership assets to Hormel. The following table sets forth the pertinent data in respect of the sale by the Farhas to Hormel of the respective interests in the partnership's assets:

| Seller | Sale price | Seller's adjusted basis in interest sold | Gain realized | Payments received at date of sale and during 1967 | Purchaser's obligations received |
| --- | --- | --- | --- | --- | --- |
| Chick_____ | $375,943.50 | $47,041.01 | $328,902.49 | $32,977.50 | $342,966 |
| Fred_____ | 9,148.50 | 5,324.58 | 3,823.92 | 802.50 | 8,346 |
| Sue_____ | 93,964.50 | 15,911.66 | 78,052.84 | 8,242.50 | 85,722 |
| Woodrow_____ | 375,943.50 | 48,480.60 | 327,462.90 | 32,977.50 | 342,966 |

The second agreement was also entitled "Purchase Agreement" and pertained to the sale by the Farhas to Hormel of the corporation's stock. After reciting various representations and warranties this agreement provided in pertinent part as follows:

1. On the delivery date each of the FARHAS will sell and deliver to HORMEL the number of shares of common capital stock of the COMPANY [3] set forth below opposite his or her name, free and clear of all liens, the certificates evidencing said shares to be duly endorsed and ready for immediate transfer and accompanied by the requisite amount of documentary stamps to evidence payment of all transfer taxes required to be paid thereof:

| Name | Number of Shares |
|---|---|
| Woodrow W. Farha | 2,560 |
| Chick M. Farha | 2,560 |
| Sue M. Farha | 640 |
| Fred M. Farha | 640 |

2. The purchase price to be paid by HORMEL to each of the FARHAS shall be $50.78125 per share, payable on the delivery date by certified or cashier's checks, and promissory notes of HORMEL dated August 1, 1967, payable to the FARHAS in the amounts set forth on Exhibit "A" and on the dates set forth on Exhibit "A". The aforesaid notes shall be in the form hereto attached as Exhibit "B", except that the notes due Woodrow W. Farha and Chick M. Farha on August 19, 1970 and August 19, 1971 shall be nonnegotiable (when, if and as the holders of said nonnegotiable notes shall have satisfied HORMEL prior to the maturity of said nonnegotiable notes that all obligations of COMPANY have been paid, HORMEL shall reissue such notes as negotiable notes).

3. HORMEL and FARHAS will, at some date subsequent to August 19, 1967 and prior to September 19, 1967, cause the COMPANY to redeem all of the remaining issued and outstanding shares then owned by FARHAS, being in the aggregate amount of 1,600 shares. The redemption price to be paid by COMPANY to the FARHAS shall be an amount equal to the sum of the following:

(a) All of the cash owned by the COMPANY, being cash on hand or in bank as of the close of business on August 19, 1967.

(b) All accounts receivable owned by the COMPANY as of the close of business on August 19, 1967, including trade accounts receivable, receivables from officers, receivables from employees and special deposits (which accounts shall be assigned to FARHAS in lieu of cash).

(c) An amount equal to the inventory of product as of the close of business on August 19, 1967, with the inventories of finished product being calculated at seventy-five (75%) percent of the wholesale price at which COMPANY ordinarily sells such finished product and at one hundred (100%) percent of the cost of all raw materials (including meats and condiments) and supplies.

(d) An amount equal to unexpired insurance and prepaid expenses.

(e) And less all amounts paid subsequent to the close of business August 19, 1967 in the discharge of COMPANY indebtedness accrued on or before the close of business before July 31, 1967.

4. The redemption of FARHAS' remaining twenty (20%) percent of the stock shall be in exact proportion to the ownership by the FARHAS of the redeemed stock.

Under this second agreement the delivery date agreed upon for the sale by the Farhas to Hormel of the initial 6,400 shares of the corporation's stock was August 19, 1967. Hormel was to pay for these 6,400 shares as follows:

---

[3] The term "COMPANY" as employed in this second agreement refers to the corporation.

| Form of payment | Payments to: | | | | |
| --- | --- | --- | --- | --- | --- |
| | Chick | Fred | Sue | Woodrow | Totals |
| Cash | $10,000 | $2,500 | $2,500 | $10,000 | $25,000 |
| Note due 8/19/68 | 24,000 | 6,000 | 6,000 | 24,000 | 60,000 |
| Note due 8/19/69 | 24,000 | 6,000 | 6,000 | 24,000 | 60,000 |
| Note due 8/19/70 | [1] 24,000 | 6,000 | 6,000 | [1] 24,000 | 60,000 |
| Note due 8/19/71 | [1] 24,000 | 6,000 | 6,000 | [1] 24,000 | 60,000 |
| Note due 8/19/72 | 24,000 | 6,000 | 6,000 | 24,000 | 60,000 |
| Totals | 130,000 | 32,500 | 32,500 | 130,000 | 325,000 |

[1] Nonnegotiable.

On August 19, 1967, the Farhas received the cash and notes as provided under the second agreement and on that date each of the Farhas transferred to Hormel 80 percent of the corporation's stock owned by each of them. The following table sets forth the pertinent data in respect of the transfer by the Farhas to Hormel on August 19, 1967, of 80 percent (6,400 shares) of the corporation's stock:

| Transferor | Transfer price | Transferor's adjusted basis in stock transferred | Gain realized | Payments received at date of transfer and during 1967 | Transferee's obligations received |
| --- | --- | --- | --- | --- | --- |
| Chick | $130,000 | $35,099.02 | $94,900.98 | $10,000 | $120,000 |
| Fred | 32,500 | 8,774.74 | 23,725.26 | 2,500 | 30,000 |
| Sue | 32,500 | 8,774.74 | 23,725.26 | 2,500 | 30,000 |
| Woodrow | 130,000 | 35,099.02 | 94,900.98 | 10,000 | 120,000 |

Sometime after August 19, 1967, and prior to September 19, 1967, each of the Farhas transferred to the corporation the remaining 20 percent of the corporation's stock owned by each of them. In return the Farhas received cash in accordance with the terms of the second agreement. The following table sets forth the pertinent data in respect of this transfer to the corporation:

| Transferor | Amount received | Transferor's adjusted basis in stock transferred | Payments received at date of transfer and during 1967 | Gain realized and to be recognized in 1967 |
| --- | --- | --- | --- | --- |
| Chick | $123,246.55 | $13,948.06 | $123,246.55 | $109,298.49 |
| Fred | 30,811.65 | 3,486.99 | 30,811.65 | 27,324.66 |
| Sue | 30,811.65 | 3,486.99 | 30,811.65 | 27,324.66 |
| Woodrow | 123,246.54 | 13,948.05 | 123,246.54 | 109,298.49 |

Upon this transfer the Farhas received a total of $308,116.39 which, when allocated over the 1,600 shares transferred, was equivalent to approximately $192.5727 per share.

After the Farhas' transfer of their remaining 20 percent of the corporation's outstanding capital stock, Hormel was the owner of all of the corporation's outstanding capital stock. On September 30, 1967,

the corporation was liquidated; Hormel acquired all of its assets and assumed all of its liabilities.

In the third agreement which was also executed on August 19, 1967, the Farhas severally covenanted and agreed with and for the benefit of Hormel—

that within the County of Oklahoma, State of Oklahoma, and for a period of three (3) years from August 19, 1967, they will not engage, directly or indirectly, by stock ownership or otherwise, in the business of manufacturing or selling fabricated meat products, or in any business comparable to that which they have heretofore carried on under the name of Hereford Heaven Brands, Inc. They further agree that they will not permit themselves to be employed in Oklahoma County, Oklahoma, in any business competitive with that which they formerly carried on as employees of Hereford Heaven Brands, Inc.; provided, however, that the ownership of shares in any such business which are listed on any national securities exchange shall not be deemed a violation of this covenant.

In 1967 pursuant to the terms of this covenant not to compete each of the Farhas received from Hormel $2,500 in cash and $7,500 in promissory notes. The promissory notes were not payable until after 1967.

On their respective income tax returns for the calendar year 1967, the Farhas each claimed installment sale treatment under section 453 in respect of the gain they realized on their August 19, 1967, transfer to Hormel of 80 percent of the corporation's stock. In the respective notices of deficiency herein, respondent determined that section 453 was not applicable to that transfer. As a result, respondent included the entire gain on the transfer in determining petitioners' income taxes for 1967, and increased the individual taxpayer's gain recognized in 1967 as follows:

| Petitioner | Increase in gain recognized in 1967 |
|---|---|
| Chick | $87,444.53 |
| Fred | 21,861.15 |
| Sue | 21,861.15 |
| Woodrow | 87,444.53 |

Petitioners were the only shareholders of a corporation engaged in buying, processing, and selling various meat and food products. They were also the only partners (though in slightly different ratios of ownership) of a partnership which owned the land and building which the corporation used for its business and which owned certain trademarks and trade names under which the corporation sold its products.

On August 19, 1967, petitioners entered into three separate written agreements with Hormel. In one agreement petitioners, as partners, sold the partnership's land, building, trademarks, trade names, and

goodwill to Hormel for a total of $855,000. By the second agreement petitioners, as shareholders, purported to sell 80 percent of the corporation's stock and Hormel agreed to effect, sometime prior to September 19, 1967, the redemption of the remaining 20 percent of the stock owned by petitioners. By the third agreement petitioners agreed that within a certain geographical area and for a period of 3 years they would not engage in a comparable meat products business.

Petitioners sought to report the purported sale of their 80 percent of the corporation's stock on the installment basis in accordance with section 453.[4] Respondent, however, determined that petitioners were not entitled to use the installment method of accounting with respect to that purported sale. He reasoned that the transfer of 80 percent of the corporation's stock on August 19, 1967, and the subsequent redemption less than a month later of the remaining 20 percent of the corporation's stock constituted a single sale. Under respondent's rationale the total consideration received by each of the Farhas in 1967 in respect of the purported sale and the subsequent redemption exceeded 30 percent of the selling price of all of the corporation's stock. Consequently, it is respondent's conclusion that the sale did not meet the limitation of section 453(b)(2)(A) which allows installment method of accounting for a casual sale of personal property *only if* in the taxable year of the sale there are no payments or the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

The question we must answer is basically a factual one: For the purposes of the Internal Revenue Code of 1954, should the purported sale and subsequent redemption be considered two independent transactions or should they be viewed as interdependent steps of a single, integrated transaction?

---

[4] SEC. 453. INSTALLMENT METHOD.

  (a) DEALERS IN PERSONAL PROPERTY.—

    (1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

     \*       \*       \*       \*       \*       \*       \*

  (b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

    (1) GENERAL RULE.—Income from—

      (A) a sale or other disposition of real property, or

      (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

    (2) LIMITATION.—Paragraph (1) shall apply—

      (A) \* \* \* only if in the taxable year of the sale or other disposition—

     \*       \*       \*       \*       \*       \*       \*

        (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

534

We need not catalog the numerous cases which support the proposition that in matters of taxation where various steps are employed to achieve an end which could have been achieved through one transaction, and where such intermediate steps lack independent significance of their own, the series of steps will be considered merely component parts of a single transaction. See, e.g., cases cited in 3 Mertens, Law of Federal Income Taxation, secs. 20.163–20.165, pp. 699–725 (Zimet & Weiss rev. 1965). The parties seem to agree on this general principle but differ as to its application to the facts in the present case.

On the basis of the stipulated record here we find that we must follow respondent's reasoning.

In his explanations accompanying the notices of deficiency herein respondent clearly indicated to petitioners that he had determined that the purported sale and subsequent redemption constituted a single sale. Petitioners therefore had the burden to show that each of the two steps in the disposition of all of their stock in the corporation had some purpose other than to reduce their taxes in 1967. The parties have stipulated that on August 19, 1967, petitioners owned all of the corporation's shares and that 1 month later they had completely divested themselves of all such shares. For their part petitioners have not shown any independent purpose sufficient to justify the short-lived retention by them of 20 percent of the corporation's stock. Since they have failed to reveal any reasonable nontax motive for dividing the disposition of their entire interest in the corporation into two steps, we have no course but to adopt respondent's characterization of the two steps as a single sale.

But even if the purported sale and subsequent redemption could be considered separate transactions having independent tax significance, it would defy our fact-finding powers to reconcile the purported· sale price of $50.78 per share on August 19, 1967, with the redemption price of $192.57 per share less than a month later. Petitioners have failed to explain how the per-share value of the corporation's stock almost quadrupled in such a short time.[5] In the absence of very persuasive evidence, we would not be bound to accept the values which Hormel and petitioners formulated in their written agreement. See, e.g., *Particelli* v. *Commissioner*, 212 F. 2d 498 (C.A. 9, 1954), affirming a Memorandum Opinion of this Court; *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761 (C.A. 10, 1954), affirming 19 T.C. 718 (1953);

---

[5] In view of this great price-per-share discrepancy, petitioners' explanation that the time lag was necessary because on Aug. 19, 1967, they did not and could not know the collectibility of accounts receivable, the value of inventories, and the amount of accounts payable is in itself a strong argument that there was a single sale of the corporate stock.

cf. *Blackstone Realty Co.* v. *Commissioner*, 398 F. 2d 991, 997 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court.

On the facts before us, we would have great difficulty in finding that the per-share value at the time of the purported sale was not approximately the same as the per-share value at the time of the redemption. Therefore, in order to ascertain the true per-share value at both instances we would combine the purported sale price and the redemption price and would allocate that total price ratably over the total shares which petitioners ultimately exchanged. See, e.g., *C. D. Johnson Lumber Corporation*, 12 T.C. 348 (1949), supplemented by 16 T.C. 1406 (1951). Upon this more realistic allocation, petitioners would fail to meet the 30-percent test of section 453(b)(2)(A).[6]

As an alternative argument petitioners urge that if we find that the purported sale and subsequent redemption of the corporation's stock constituted a single sale for tax purposes, then we should find that their sale, as partners, of the various partnership assets should also be considered a part of that single sale. They contend that the sale of the partnership assets combined with the disposition of the corporation's stock were merely parts of a "package" sale. Under this alternative contention petitioners calculate that in the case of each petitioner except Fred the "package" sale would have met the 30-percent test of section 453(b)(2)(A).

While we do not disagree with certain of the premises of this alternative argument, we do not believe that they support the conclusion that section 453 may be applied to the so-called "package" sale.

There are at least four ways to view the transactions which were consummated under the agreements of August 19, 1967. At one extreme each petitioner might be said to have transferred his interest in a meat and food products "business" which had as its components an active corporate production arm and a passive partnership title-holding arm. At another level, each petitioner might be said to have transferred his interest in the partnership and his shares of the corporation. At still another level, each petitioner might be said to have transferred his interest in each partnership asset and his shares of the corporation.

---

[6] For example, Chick purportedly sold 80 percent of his stock for $130,000 and subsequently the corporation redeemed the remaining 20 percent for $123,246.55. Upon a realistic allocation, we would find that the initial purported sale price was really $202,597.24 (80 percent of the total of the purported sale price and the redemption price) and that the redemption price was really $50,649.31 (20 percent of the above-parenthesized total). Since Chick received $123,246.55 in respect of the redemption transaction, no more than $50,649.31 of such amount could have been for the redemption itself. Therefore, the remaining $72,597.24 must be deemed to have constituted payment in respect of the purported sale. If added to the initial payment of $10,000, the total payments which Chick received in 1967 in respect of the purported sale would have been $82,597.24 or well in excess of 30 percent of the initial purported selling price of $202,597.24. Similar computations lead to similar results for each of the other three petitioners.

Finally, at the other extreme each petitioner might be said to have transferred his interest in each partnership asset and his interest, as represented by his shares of stock, in each of the corporation's various assets. Under their alternative argument petitioners would have us adopt the first view, and respondent would appear satisfied with any of the other three views, although on brief he regards the transactions as a sale of the partnership's assets and a sale of the corporation's stock.

In the usual installment sale situation, allocation of portions of the initial payment to specific components of the sale is not necessary because the relevant ratio of initial payments to selling price is the same whether the total initial payments are compared to the gross price or the initial payment attributable to each component is compared to an allocable portion of the gross price. *Andrew A. Monaghan*, 40 T.C. 680, 687 (1963). An allocation may become material, however, where there is a sale of a going business having at least two readily identifiable components and where the total initial payments as compared to the gross price meet the 30-percent test of section 453(b)(2)(A) but the initial payments attributable to a particular component fail to meet such test. That is the case here. For three of the four petitioners here the "package" sale of the partnership assets and the corporation's stock would meet the 30-percent test, but if considered separately the sale of the corporation's stock would not satisfy that test for any of the four petitioners.

In numerous other factual situations various taxpayers have tried, successfully and unsuccessfully, to fragmentize or to integrate sales so as to bring the sales within the percentage requirements of section 453 and its predecessors. See *Veenkant* v. *Commissioner*, 416 F. 2d 93 (C.A. 6, 1969), affirming a Memorandum Opinion of this Court, certiorari denied 397 U.S. 1029 (1970); *Blackstone Realty Co.* v. *Commissioner*, 398 F. 2d 991 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court; *Charles A. Collins*, 48 T.C. 45 (1967); *Andrew A. Monaghan*, 40 T.C. 680 (1963); *Walter E. Kramer*, 27 B.T.A. 1043 (1933); *Lubken* v. *United States*, an unreported case (S.D. Cal. 1961, 8 A.F.T.R. 2d 5073, 61-2 U.S.T.C. par. 9537); *Spielberger* v. *United States*, an unreported case (S.D. Cal. 1958, 1 A.F.T.R. 2d 1435, 58-1 U.S.T.C. par. 9431); cf. *James A. Johnson*, 49 T.C. 324 (1968).[7] Of particular relevance, we have held that for the purposes of section 453 the sale of a going business operated as a sole proprietorship should be comminuted into the sales of the separate assets of the

---

[7] See also *Arkay Drug Co.*, 3 T.C.M. 1194 (1944) and Note, "Installment Method is Denied for That Part of Sale Price of Going Business for Which, by Local Law, Taxpayer is Required To Receive Over Thirty Percent in the Year of Sale," 44 Va. L. Rev. 261 (1958).

proprietorship.[8] *Andrew A. Monaghan*, 40 T.C. 680 (1963) ; see also Rev. Rul. 68–13, 1968–1 C.B. 195; Rev. Rul. 57–434, 1957–2 C.B. 300.

To what extent, if any, should the transactions here be comminuted or fragmented?

On the stipulated record here we are presented with a factual situation in which petitioners sold certain interests with respect to two distinct entities—the corporation and the partnership. On the one hand, the inference seems strong that the function of the corporation and the function of the partnership were complementary and that when taken together the two entities comprised a larger operation which might loosely be called a "business." On the other hand, the record proves that the "business" was operated, and recognized to be operating, in a mixed form for income tax purposes. Thus, the "business" existed as two separate taxable entities and there is no evidence that Hormel would not have been happy to obtain either one without the other.

The facts here presented are that petitioners made the choice to conduct their "business" in mixed form and to have the separate entities of corporation and partnership recognized for income tax purposes. Petitioners then cast their sales to Hormel·in this same form and respondent's determinations have adopted and confirmed it. Recognizing this posture we can only conclude that petitioners have not carried their burden of proving that the substance of their actions was the single sale of the "business" and we cannot permit them to ignore the existence of the separate entities in accounting for the gains from such sales. Therefore, we hold that for the purposes of section

---

[8] Whether for tax purposes, a business should be "comminuted into its fragments" (*Williams* v. *McGowan*, 152 F. 2d 570, 572 (C.A. 2, 1945)), is a question which has been more fully discussed in those cases where, upon the sale of a business, the issue has been one of characterization of profit as capital gain or ordinary income. Thus, upon the sale of a business which has been operated as a sole proprietorship, each of the proprietorship's assets must be considered individually and the profit attributable to each asset must be determined according to whether the sale of each asset would have resulted in capital gain or ordinary income. E.g., *Williams* v. *McGowan, supra; Redman L. Turner,* 47 T.C. 355, 360 (1967) ; *Peter Raich,* 46 T.C. 604, 611 (1966) ; Rev. Rul. 55–79, 1955–1 C.B. 370. However, the sale by a business corporation's stockholders of all of the corporation's stock is generally regarded as a sale of a capital asset and, hence, susceptible to capital gain treatment. Secs. 1001, 1002, 1201, 1202, 1221. In characterizing the profit on a sale of a corporation's stock, the corporate entity will usually be respected and the character of the individual corporate assets will not be examined. But see, e.g., secs. 306(a), 341(a), 995(c), 1248(a).

The characterization of profit from the sale of a partnership interest takes a slightly mixed course. Gain or loss from the sale of a partnership interest "shall be considered as gain or loss from the sale or exchange of a capital asset" except to the extent that such gain or loss is attributable to certain "hot assets." Secs. 741, 751(a) ; A. Willis, On Partnership Taxation 226, 329 (1971). In the instant case it is not clear from the record, nor is it material to our decision, whether petitioners sold partnership interests or partnership assets. For examples where the distinction between the sale of a partnership interest and the sale of a partnership asset was important compare *W. Ferd Dahlen,* 24 T.C. 159 (1955), with *Cedar Valley Distillery, Inc.,* 16 T.C. 870, 879 (1951).

453 the transactions of August 19, 1967, amounted to two sales—(1) a sale by each petitioner of all of his shares in the corporation and (2) a sale by each petitioner of either his interest in the partnership or of his interest in each of the partnership assets transferred to Hormel.

*Decisions will be entered for the respondent.*