LEON H. PERLIN COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LEON H. PERLIN AND PHYLLIS F. PERLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Leon H. Perlin Co. v. Commissioner
Docket Nos. 12026-89, 12027-89
United States Tax Court
T.C. Memo 1993-79; 1993 Tax Ct. Memo LEXIS 81; 65 T.C.M. (CCH) 2013; March 9, 1993, Filed *81 Decision will be entered under Rule 155. For petitioners: Richard J. Melnick and Randal D. Shields. For respondent: Judy Jacobs Miller. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined a deficiency of $ 153,056 in the individual petitioners' Federal income taxes for the taxable year 1984 and deficiencies in the corporate petitioner's Federal income taxes as follows: Tax Year Ended
Deficiency
May 31, 1981
$20,749 May 31, 1982
54,194
May 31, 1984
108,963
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues remaining for decision are: (1) Whether the unsecured advances of $ 494,101 by Leon H. Perlin Company, Inc., to Middle Plantation of Williamsburg, Inc., became worthless during the fiscal year ended May 31, 1984; (2) Whether the individual petitioner, Leon H. Perlin, received a constructive dividend of $ 494,101 in 1984 by personally receiving payment from Realtec Incorporated for his and his company's claims against and interests *82 in Middle Plantation of Williamsburg, Inc.; and (3) Whether an adjustment in the purchase price paid by Realtec Incorporated to the individual petitioner, Leon H. Perlin, is warranted under the price-interest recomputation rule of section 15A.453-1(c)(2)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time their petition was filed, the individual petitioners, Leon H. Perlin (petitioner) and Phyllis F. Perlin (Mrs. Perlin), resided in Virginia Beach, Virginia. The corporate petitioner, Leon H. Perlin Company, Inc. (Perlin Company), was a Virginia corporation which liquidated in 1986. Its principal office was located in Virginia Beach, Virginia. During the years 1977 through 1983, Perlin Company was engaged in the business of constructing large commercial projects, such as hotels and office buildings. Petitioner owned all of the outstanding stock of Perlin Company from its formation in 1958 to its dissolution in 1986. Petitioner's Initial Involvement *83 with Hab Baker and Middle Plantation of Williamsburg, Inc.
Prior to December 2, 1977, approximately 1,400 acres of land in James City County, Virginia (the Property), were owned by GMR Properties, a Massachusetts Business Trust (GMR). In late 1977, Hab Baker (Baker), a real estate developer, had the opportunity to purchase the Property but lacked the cash needed to finance the purchase. He approached petitioner to inquire whether petitioner would be interested in lending money to his (Baker's) company to purchase the Property and develop it as a planned unit development, which would include residences, condominiums, apartments, club facilities, recreational facilities, and shopping areas. The plans for the development had been formulated at an earlier time by another developer whose business had failed. Baker intended to continue the project and to complete it through a company he had formed called Middle Plantation of Williamsburg, Inc. (MPW). By contract dated December 2, 1977 (the Contract), petitioner agreed to advance to MPW the sum of $ 325,000, to be used in the purchase of the Property and for related expenses. At that time, Baker owned an 84-percent controlling interest *84 in MPW. In consideration of petitioner's loan of $ 325,000 and the cancellation of a $ 25,000 note that Baker had previously issued to petitioner, MPW issued an interest-bearing note to petitioner in the face amount of $ 380,000 (the $ 380,000 Note). The Contract provided that, if the $ 380,000 Note were paid at maturity or at the expiration of any extension of time for payment thereof, the principal balance due would be reduced by $ 30,000. The $ 380,000 Note was due in full in 1 year. The $ 380,000 Note was signed by Baker on behalf of MPW and also was signed by Baker and his wife, Cheryl Baker, personally. The $ 380,000 Note was secured by: (1) a second mortgage on the entire Property (the 1,400 acres); (2) an assignment by Baker of his general partnership interest in Tidewater Green Enterprises, a Virginia limited partnership (Tidewater); [1] (3) a pledge by Baker of all of his 8,400 shares in MPW; and (4) a $ 350,000 life insurance policy on the life of Baker. *85 Pursuant to the Contract, petitioner immediately received 8.5 percent of the stock of MPW. In addition, the Contract gave petitioner the option of extending the $ 380,000 Note in the event that the $ 380,000 Note was not paid at maturity. In consideration of each 30-day extension of that note, Baker agreed to transfer to petitioner .54 percent of all of the issued and outstanding stock of MPW. On November 29, 1977, MPW purchased the Property from GMR for $ 1.75 million. MPW used $ 250,000 of the funds borrowed from petitioner to purchase the Property from GMR. MPW gave GMR a $ 1,500,000 note (the First Trust Note or the Secured Note), secured by a first deed of trust, for the balance of the purchase price. On December 2, 1977, MPW also executed a second deed of trust on the Property to secure the $ 380,000 Note issued to petitioner by MPW. The Property was the principal asset of MPW. Formation of Long Hill to Develop the Property
Baker's attempts to develop the Property were not successful. Additional financing sources (other than petitioner and Perlin Company) could not be obtained. Between 1978 and early January of 1981, Perlin Company had made unsecured advances *86 to MPW in the aggregate principal amount of $ 494,101 (the Unsecured Advances). The status of those Unsecured Advances in 1984 is the primary issue in this case. Prior to January 30, 1981, MPW defaulted on the $ 380,000 Note to petitioner. As a result of that default the Georgetown Condominiums were transferred to petitioner. It is unclear from the record as to exactly how or in what capacity petitioner obtained title to the Georgetown Condominiums. There was subsequent litigation between Baker and petitioner in that regard, with Baker claiming that petitioner held the condominiums in a fiduciary or trustee capacity and that petitioner was not the beneficial owner. It is clear that the Georgetown Condominiums were more valuable than the unpaid balance of the $ 380,000 Note. Petitioner took over the Georgetown Condominiums as a result of MPW's default on the $ 380,000 Note, and on January 30, 1981, he refinanced the project with a first mortgage loan of $ 725,000, most of which was used to pay off the then existing first and second mortgages on the condominiums. [2]
*87 By mid-1981, petitioner had decided not to lend MPW any additional funds. At that time, MPW was not current on its payments under the First Trust Note. Furthermore, the then holder of the First Trust Note, Grubb & Ellis (successor of GMR), was threatening to foreclose on the Property. Also, in mid-1981, Richard Ford (Ford), President of Realtec Incorporated (Realtec), learned that the Property possibly was available for sale. Ford and Gary L. Steadman (Steadman), executive vice president of Realtec, contacted Baker and expressed an interest in purchasing the Property. However, their initial inquiries proved fruitless because of Baker's unrealistic views as to the value of the Property: Baker was asking approximately $ 8 to $ 10 million for the Property, which Ford and Steadman considered to be far in excess of the Property's then fair market value. During the same time period, petitioner became increasingly concerned about protecting his investment in MPW. Petitioner learned of Realtec's interest in the Property and contacted Ford through a mutual acquaintance. Petitioner told Realtec that he was a shareholder in MPW and saw Realtec as a potential purchaser who could resolve *88 some of the problems that MPW had been having with the project. Although Baker had the controlling interest in MPW, petitioner did not want Realtec to abandon pursuit of the Property without further attempts to sway Baker or, alternatively, to circumvent Baker. Baker continued, throughout this period, to resist all offers to purchase the Property. Petitioner and Realtec officials had a number of discussions to find a way to acquire the Property without Baker's consent. Discussions centered around petitioner's having a proxy to vote Baker's stock in MPW as a result of the amounts of money owed by Baker and MPW to petitioner and his Perlin Company. Having learned of the intentions of petitioner and Realtec in this regard, Baker sent a telegram to Realtec stating that he had revoked any such existing proxy and that no deal could be completed without his consent. It was during this period in mid-1981 that an opportunity arose to purchase the first mortgage (the First Trust Note) on the Property. Grubb & Ellis contacted petitioner to inquire as to his interest in acquiring the First Trust Note at a significant discount. Petitioner contacted Realtec, and they discussed forming a *89 joint venture to acquire the First Trust Note. It was thought that acquisition of the mortgage, under which MPW was in default, would strengthen Realtec's negotiating position with Baker concerning the purchase of the Property. On November 30, 1981, the First Trust Note had a remaining principal balance of $ 1,092,442.50. MPW was then in default on payments on the First Trust Note. On December 22, 1981, petitioner and Realtec entered into a joint venture agreement (the LHP Agreement), forming Long Hill Properties Joint Venture (Long Hill) for the purpose of acquiring and holding the First Trust Note on the Property. Pursuant to the LHP Agreement, petitioner and Realtec became 50/50 joint venturers, and each contributed $ 200,000 to the capital of Long Hill. That capital was used to purchase the First Trust Note for $ 400,000. [3]
*90 The LHP Agreement gave petitioner the right to receive payments and keep one-half of the regular principal and interest payments made by MPW on the First Trust Note. However, the LHP Agreement gave Realtec the sole authority to make all determinations regarding the collection of or foreclosure on that note. [4]
In addition, the LHP Agreement provided that, if the Property were acquired, the joint venturers would enter into another future venture for the purpose of jointly owning, developing, marketing, and selling the Property. Petitioner would be a 49-percent partner in such a future joint venture, and Realtec or its designee would be the 51-percent partner. The agreement further provided that: The future venture will assume some Nine Hundred Thousand and 00/100th Dollars ($ 900,000) *91 of indebtedness currently owned [sic] by Middle Plantation of Williamsburg, Inc. to [petitioner]. [Petitioner], however, agrees to reduce such indebtedness to the maximum extent possible by liquidating any security, other than the [Property], that he may have therefor.
The $ 900,000 was approximately the total amount that petitioner and Perlin Company had loaned to MPW. That included the $ 350,000 (for which the $ 380,000 Note was issued) some portion of which had been repaid by MPW, approximately another $ 100,000 advanced by petitioner, and the $ 494,101 Unsecured Advances made by Perlin Company. After the First Trust Note was acquired, Long Hill offered to sell it to MPW for $ 400,000, but Baker declined. Apparently Baker was completely broke at that time and could not or would not purchase the First Trust Note even at that greatly discounted (over 60 percent) price. Following the acquisition of the First Trust Note, but prior to March 24, 1982, Long Hill sent MPW a notice of default, and then a notice of intent to file for foreclosure on the Property. On March 24, 1982, MPW initiated proceedings under Chapter 11 of the Bankruptcy Code to forestall a foreclosure sale *92 of the Property and to attempt to reorganize. [5] *93 Petitioner and Perlin Company together filed a proof of claim with the bankruptcy court for a total amount of $ 822,963.93, plus interest, attorney's fees, and costs. The claim recited that a loan of $ 542,302.72 was evidenced by a Note and Deed of Trust dated December 2, 1977, and that there were unsecured loans of $ 597,661.21. [6] Long Hill also filed a proof of claim with the bankruptcy court in the amount of $ 1,266,758.55, plus interest, attorney's fees, and costs. Long Hill's claim stated that a loan of $ 1,500,000 was evidenced by the First Trust Note and a First Deed of Trust dated November 29, 1977. On September 17, 1982, Long Hill, as a creditor of MPW, filed its first Plan for Rehabilitation of the Middle Plantation Property (the Initial Plan) with the bankruptcy court. This Initial Plan was signed by Realtec and by petitioner as joint venturers in Long Hill. Under the Initial Plan, petitioner's claim arising from the $ 380,000 Note was classified as the only Class 5 claim. The Class 5 claim was to have been deemed satisfied upon confirmation of the Initial Plan. All unsecured, non-priority claims of creditors, other than Colonial American Mortgage Corporation and the officers, directors, employees, *94 or stockholders of MPW or any related corporations, were classified as Class 11 claims. The Initial Plan provided that the unliquidated claims of the Class 11 creditors would be paid by Long Hill in full, in cash, subject to offsets and credits, upon allowance by the bankruptcy court. At that time, Realtec intended to pay all of the claims of unrelated parties in order to gain their support for the Realtec plan, as opposed to other competing bankruptcy plans. Petitioner's claims were not considered to be Class 11 claims. All unsecured, nonpriority claims of the officers, directors, employees, or stockholders of MPW or related corporations were classified as Class 14 claims. These claims were to be satisfied out of the remaining assets of the debtor, MPW. No claims of any class were impaired by the Initial Plan. That Initial Plan was not approved by the bankruptcy court. When the Initial Plan was not approved, Ford and Steadman considered abandoning their efforts to acquire the Property. They viewed the rejection of the Initial Plan as a strategic setback. They had always wanted a simple, straightforward purchase of the Property from Baker. The bankruptcy proceedings were *95 proving to be a significant drain on Realtec's assets. Ultimately, Ford and Steadman decided that they would go forward, but only if they could acquire all of petitioner's interests in MPW and Long Hill so that Realtec would own 100 percent of any venture involving the Property. Accordingly, Steadman, on behalf of Realtec, and petitioner entered into arm's-length negotiations concerning: (1) The sale of petitioner's interest in Long Hill, (2) the other creditor and shareholder interests owned by petitioner and Perlin Company in MPW, and (3) petitioner's net financial interest in the Georgetown Condominiums. Steadman was attempting to formulate an overall method of acquiring the Property from Baker and of buying out petitioner's interest in Long Hill and MPW. In arriving at a proposal to present to petitioner, Steadman considered how much money petitioner and his company had invested in MPW and the project. He reasoned that such an amount might be a price that petitioner would be willing to accept for his interest since the price was designed to reflect all of the amounts that petitioner and Perlin Company had invested. Mr. Steadman's priority in negotiating the acquisition of *96 petitioner's various interests was the preservation of cash. He wanted to make a minimal initial cash payment. Subsequent payments, then, could be made from amounts earned by the project in order to maintain adequate cash flow for Realtec. Steadman and petitioner met in Atlanta, Georgia, to negotiate a final agreement. Steadman initially proposed paying to petitioner $ 275,000 in cash at closing (representing petitioner's investment in Long Hill and legal and accounting fees), $ 250,000 in cash at the end of 1984, a $ 250,000 interest-bearing note with interest due in 2 years, a $ 250,000 interest-bearing note with interest due in 5 years, and a $ 175,000 interest-bearing contingent note due in 6 to 10 years. Petitioner did not accept Steadman's initial proposal. During the negotiations, changes both in the structure of the transaction and in the dollar amounts were made. No specific allocations of the purchase price for petitioner's interests were made to the $ 380,000 Note or to his interest in Long Hill. The Realtec Agreement with Petitioner
By letter dated June 6, 1983, and amended June 17, 1983, petitioner and Realtec memorialized their final agreement for the *97 acquisition by Realtec of petitioner's interest in Long Hill, petitioner's interest in the Georgetown Condominiums, [7] and all other creditor and/or shareholder claims of petitioner and Perlin Company against MPW (the Realtec Agreement). At the time of the negotiations and the signing of the Realtec agreement, Steadman did not distinguish between petitioner's interests and claims and Perlin Company's interests and claims. Realtec's goal was to purchase petitioner's total involvement in MPW and Long Hill, both his individual involvement and his involvement through his wholly owned corporation. Steadman, a licensed attorney, drafted the Realtec Agreement. In the Realtec Agreement, Steadman explained that he and Ford had had to reassess "where the Middle Plantation *98 situation might be headed". He foresaw that the final outcome of the bankruptcy proceedings would be Realtec's acquisition of the Property either through the bankruptcy court's acceptance of Realtec's Modified Plan or through Realtec's making the highest bid at a forced sale. The outcome through either method would require a substantially greater investment by Realtec than originally contemplated. Steadman further recited that: It is difficult for us to consider such an investment until we have reached agreement regarding the terms of a buy-out by Realtec of your position in Long Hill Properties. Although those terms have been previously discussed in the context of a settlement with [Baker], we are now looking at acquiring the property in a manner different than originally contemplated. I am accordingly setting forth the substance of an understanding which, hopefully, will cover all contingencies.
The Realtec Agreement provided that the purchase of petitioner's various interests was contingent upon Realtec's acquisition of the Property, whether through the bankruptcy proceeding or otherwise. The consideration agreed to by petitioner and Realtec consisted of a cash payment *99 of $ 249,805 and four notes, each having a face amount of $ 250,000. The terms of the Realtec Agreement were as follows: (1) Realtec would purchase petitioner's $ 200,000 share in the GMR mortgage (the First Trust Note) for $ 200,000, plus legal and accounting expenses of $ 49,805; (2) Petitioner was to convey any unsold Georgetown Condominiums to Baker, if Baker could refinance or relieve petitioner of responsibility for the first mortgage. Petitioner was to account to Baker for the time the condominiums were in his possession. Alternatively, petitioner could sell the condominiums and give Baker the proceeds; [8]
(3) A $ 250,000 note for cash to be paid 6 to 9 months after acquisition of the Property by Realtec. These funds would not bear interest; (4) A $ 250,000 interest-bearing note due in 2 years after acquisition of the Property; (5) A $ 250,000 interest-bearing note due in 5 years after acquisition of the Property; and (6) A $ 250,000 Contingent Note due in 10 years after acquisition of the Property. Paragraph 5 of the Realtec Agreement specifically stated: Additionally, a contingent note in the face amount of $ 250,000 will be delivered to you upon *100 acquisition of the property, payable ten years after the date of acquisition if certain profit projections are met. We can discuss further the precise profit levels that payment of the note will be contingent upon, but I would expect them to be minimal, perhaps only requiring that the company at that time have a net worth of at least $ 2,000,000. The note will bear contingent interest beginning in its sixth year at prime with a collar of 8% and 12%, such interest being contingent on year-to-year profit levels of at least $ 250,000.
*101 The Contingent Note was expressly made payable only if the development of the Property was successful. At the time of the Realtec Agreement, both petitioner and Realtec understood that there would be a risk of failure and that two developers of that land had previously failed. [9]
The Realtec Agreement attempted to provide contingency plans in the event that the bankruptcy court did not approve Realtec's modified *102 bankruptcy plan as drafted: If, however, a bankruptcy plan or settlement is ultimately approved that does not include the Georgetown Apartments, or if the same result occurs because we acquire the project by bids at a forced sale, the cash portions of our arrangement will be reduced by elimination of the $ 250,000 due six to nine months after acquisition of the property, and the $ 250,000 note payable two years after the date of acquisition will be reduced by an amount equal to one-half of the net proceeds ultimately realized by you from the disposition of the units. Such net proceeds shall be defined as the gross selling prices of the units less the outstanding loan secured by the project, selling expenses and carrying costs incurred subsequent to the date hereof.
The Realtec Agreement also provided that, if petitioner received a distribution in bankruptcy as either a creditor or shareholder of MPW, the purchase price would be offset by the amount of any such recovery on a dollar-for-dollar basis, with the offset first applied against amounts due under the Contingent Note. Since the Realtec Agreement was executed prior to Realtec's submission of its Modified Plan to the *103 bankruptcy court, there remained the possibility that the bankruptcy court could reject the plan, order a sale of the Property, and use the proceeds to pay pending claims against the debtor. Realtec, having purchased all of the claims of petitioner and Perlin Company against MPW, wanted to protect Realtec's beneficial interest in such claims in the absence of a formal assignment of those claims. Steadman viewed Realtec as having bought all of the interests and claims of petitioner and his company in MPW and Long Hill. Therefore, if any payments by the debtor's estate were made to petitioner on any of those claims or interests, that money would be returned or credited to Realtec since it in effect now owned those claims and interests. Thus, Steadman included the following provision: Finally, if, by reason of a forced sale or otherwise, you receive a distribution as either a creditor or shareholder of Middle Plantation of Williamsburg, Inc., our arrangement with you would be reduced on a dollar-for-dollar basis, first with respect to the contingent note and then to the other notes.
Realtec considered the payments to be made under the Realtec Agreement to satisfy all of petitioner's *104 interests in and claims against MPW (including those of Perlin Company) and against Long Hill; thus, if petitioner or Perlin Company were to get payments as a result of the bankruptcy proceedings, there should be corresponding reductions in the amount that Realtec was obligated to pay to petitioner. Approval of the Modified Plan
After concluding the Realtec Agreement with petitioner in June of 1983, Steadman, as sole representative of Long Hill (acting by and through Realtec), submitted a Modified Plan to the bankruptcy court on July 15, 1983. The Modified Plan divided the allowed claims against the debtor (MPW) into seven classes, each of which was not impaired under the plan. The Modified Plan provided that the secured claim (the First Trust Note) of Long Hill, which was the only Class 2 claim, was to be satisfied by either (1) the retention by Long Hill of its mortgage lien on the Property, or (2) at its option, the transfer to Long Hill or its nominee, on the effective date of the Modified Plan, of the Property and such other property of the debtor (with the exception of the proceeds of the settlement of the Middle Plantation litigation) as Long Hill may select. The *105 Modified Plan stated that the Class 2 claim was not impaired under the Plan. The $ 380,000 Note, [10] which evidenced petitioner's personal loan to MPW and which was secured by a second mortgage on the Property, was a Class 5 claim under the Modified Plan. According to the Modified Plan, the debtor's obligations with respect to all Class 5 claims were to be assumed by Long Hill. The Modified Plan stated that "Class 5 Claims are not impaired under the Plan." Perlin Company's Unsecured Advances of $ 494,101 to MPW were Class 7 claims under the Modified Plan. The Modified Plan provided that all Class 7 claims were to be paid in full in cash on the effective date of the Modified Plan and were not impaired under the plan. *106 The Modified Plan also stated that Long Hill would contribute to the plan sufficient cash to satisfy in full all of the Class 7 claims. Again, it was Realtec's intention to gain support from the unrelated, unsecured creditors of MPW for its bankruptcy plan. Under the Modified Plan, all allowed unsecured claims (other than petitioner's claims) were paid in full by the bankruptcy trustee. The Modified Plan was approved on October 5, 1983. On January 11, 1984, the United States District Court for the Eastern District of Virginia entered a judgment affirming the bankruptcy court's confirmation of the Modified Plan. In March of 1984, through a trustee's deed, the Property was transferred to Ford's Colony at Williamsburg, Inc. (Ford's Colony), a subsidiary of of Realtec organized to acquire and develop the Property. This transfer was in satisfaction of the $ 1.2 million claim filed by Long Hill in the bankruptcy proceeding. By letter dated April 6, 1984, Realtec delivered to petitioner $ 249,805 in cash, plus the four notes in the face amount of $ 250,000 each. The obligor on the four installment notes was Ford's Colony. The first three notes were guaranteed by Realtec, the fourth *107 note was not. The first note was to be non-interest-bearing and was due and was ultimately paid in December of 1984. The second and third notes were to bear interest at the prime rate (subject to certain restrictions), which would be paid annually. The principal amounts of those notes were due and were ultimately paid in 1986 and 1989, respectively. The fourth note (the Contingent Note) is due in full in 1994 and is contingent, as to both principal and interest, as follows: (1) interest began to accrue as of March 14, 1989, and was payable commencing March 14, 1990; (2) interest is payable only if Ford's Colony earned a net profit of $ 250,000 or more in the prior fiscal year; (3) the $ 250,000 principal balance is payable only if the aggregate of Ford's Colony's net worth and its dividend distributions are at least $ 2 million as of the end of the fiscal year immediately preceding the due date. Other than what petitioner received pursuant to the Realtec Agreement, neither he nor Perlin Company received any amount on the claims they filed in the bankruptcy proceeding. Neither petitioner nor Perlin Company objected to the Modified Plan or to the final distributions made in the *108 bankruptcy proceeding. Also as part of the overall settlement of the MPW bankruptcy proceeding, various collateral lawsuits, including the litigation between Baker and petitioner over the Georgetown Condominiums, were dismissed. See supra note 3. Liquidation of Perlin Company
Petitioner began to wind down the business of Perlin Company in 1985. Petitioner, in 1984, was not accepting additional contracts and was completing the contracts his company had already entered. Perlin Company adopted a formal plan of liquidation on December 27, 1985. On September 1, 1986, Perlin Company was formally dissolved by the Commonwealth of Virginia. Perlin Company filed its Federal corporate income tax return with the Internal Revenue Service for its fiscal year ending May 31, 1984, reporting a bad debt deduction in the amount of $ 494,101, representing the Unsecured Advances made to MPW. A letter attached to Perlin Company's return explained the deduction: Under the Modified Chapter 11 Plan filed by Long Hill * * * and the agreements and arrangements reached among the parties * * *, Realtec will acquire and pay Mr. Perlin for the entire interest of Mr. Perlin and Leon H. Perlin *109 Company, Inc. in Middle Plantation. Accordingly, Leon H. Perlin Company, Inc. will not receive payment from Middle Plantation of Williamsburg, Inc. on its outstanding loans to that entity.
The individual petitioners' 1984 Federal income tax return reported the transaction at issue as the sale of petitioner's interest in Long Hill on the installment method. The individual petitioners reported long-term capital gain of $ 399,906 with respect to the $ 499,805 cash received on the sale in 1984. They did not apply the "price-interest recomputation rule" described in section 15A.453-1(c)(2)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981) to the contingent installment note received from Ford's Colony. According to the individual tax return, petitioner's basis in Long Hill was $ 249,805. On March 9, 1989, a statutory notice of deficiency was issued to the corporate petitioner, determining income tax deficiencies for its fiscal years ending May 31, 1981, 1982, and 1984, in the amounts of $ 20,749, $ 54,194, and $ 108,963, respectively. The deficiency notice stated that: The bad debt deduction shown on your return resulting from your *110 cash advance to [MPW] is not allowable because your 100 percent shareholder, Leon H. Perlin, received full repayment of the cash advances as a part of the settlement which he negotiated on behalf of you and himself. * * * * * * Accordingly, you are treated as having constructively received repayment of the advances in the amount of $ 494,101.00 and having constructively paid the same amount to Leon H. Perlin as a dividend. * * *
On March 9, 1989, a statutory notice of deficiency was issued to the individual petitioners, determining an income tax deficiency for the calendar year 1984, in the amount of $ 153,056. Respondent determined that petitioner received a constructive dividend of $ 494,101 from Perlin Company, with the following explanation: During 1984, funds received by you as [a] result of the sale of your interest in the Long Hill Properties Joint Venture to the extent of $ 494,101.00 represented payment in satisfaction of a claim filed on behalf of Leon H. Perlin Co., Inc. * * * [in the bankruptcy proceeding]. Your receipt of this payment and failure to pay over the funds to Leon H. Perlin Co., Inc. gave you the unrestricted use of these corporate funds. *111 The $ 494,101.00 received was a taxable dividend, constructively received from Leon H. Perlin Co, Inc., * * *.
OPINION Respondent contends that petitioners have not established that the $ 494,101 Unsecured Advances of Perlin Company to MPW were not part of the payment received pursuant to the Realtec Agreement and that the Unsecured Advances became worthless during the taxable year ended May 31, 1984, or at any time. In addition, respondent contends that petitioners have failed to establish that petitioner Leon Perlin did not receive a constructive dividend of $ 494,101 during 1984 when he personally, not Perlin Company, received payment under the Realtec Agreement. Respondent also contends that the initial maximum selling price in 1984 under the installment method of accounting should not be adjusted under section 15A.453-1(c)(2)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981). Petitioners contend that the $ 494,101 unsecured debt that MPW owed to Perlin Company became worthless during the company's taxable year ended May 31, 1984. This contention is based upon petitioners' assertion that petitioner Leon Perlin received no amount *112 in compensation for the Unsecured Advances under the Realtec Agreement. Petitioners further assert that he did not receive a constructive dividend because all of the purchase price received by him from Realtec was attributable either to his personal interest in Long Hill or to his personal interest in the Georgetown Condominiums. Petitioners also argue that an adjustment of the maximum selling price is warranted due to the operation of section 483 and the price-interest recomputation rule of section 15A.453-1(c)(2)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981). I. Business Bad Debt Deduction
Section 166(a)(1) provides that a deduction shall be allowed for any debt that becomes worthless within the taxable year. Section 166(a)(2) provides that "When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction." Petitioners have the burden of proving that some or all of the $ 494,101 Unsecured Advances to MPW became worthless during Perlin Company's fiscal year ending May 31, 1984. Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598 (1981). *113 Two factors must be established to support a deduction for worthlessness: (1) the fact of worthlessness, and (2) the timing of worthlessness. The conclusions depend upon the particular facts and circumstances of the case: there is no standard test or formula for determining worthlessness within a given taxable year. Lucas v. American Code Co., 280 U.S. 445, 449 (1930); Crown v. Commissioner, 77 T.C. at 598. "However, it is generally accepted that the year of worthlessness is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope of recovery." Crown v. Commissioner, 77 T.C. at 598. A court must consider the value of collateral securing the debt, if any, and the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs. The fact that a debtor has filed a petition in bankruptcy is not in itself conclusive that a debt is worthless. The debtor may have assets that permit some payment to creditors. Patten & Davies Lumber Co. v. Commissioner, 45 F.2d 556 (9th Cir. 1930). Thus, for example, a debtor's *114 bankruptcy may establish that some part of the debt is worthless, but not that the entire debt is worthless. Teitelbaum v. Commissioner, 294 F.2d 541 (7th Cir. 1961), affg. T.C. Memo. 1960-11; sec. 1.166-2(c), Income Tax Regs. Alternatively, if a taxpayer has a claim pending in the bankruptcy proceeding, and the debt cannot be said to be totally worthless at that time, no deduction is allowed. Johnson v. Commissioner, T.C. Memo. 1984-599. Worthlessness is not established by merely demonstrating nonpayment of the debt or that collection is in doubt. To be "worthless", not only must a debt be lacking current liquid value and be uncollectible at the time the taxpayer takes the deduction, but also it must be lacking any potential value and be uncollectible at any time in the future. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972); Peraino v. Commissioner, T.C. Memo. 1982-524, affd. without published opinion 742 F.2d 1437 (2d Cir. 1983). Failure *115 to take reasonable steps to enforce collection, regardless of motive, does not justify a bad debt deduction, unless there is proof that such steps would be futile. Perry v. Commissioner, 22 T.C. 968, 974 (1954). The taxpayer must have taken reasonable steps to collect the debt. He must have exhausted all usual and reasonable means of collecting a debt before worthlessness can be found. Newman v. Commissioner, T.C. Memo. 1982-61. The subjective, good faith opinion of the taxpayer that the debt is uncollectible, standing alone, is not sufficient. Fox v. Commissioner, 50 T.C. 813 (1968), affd. per curiam 70-1 USTC par. 9373, 25 AFTR2d par. 70-891 (9th Cir. 1970). Valuation of Interests of Petitioner and Perlin Company
Respondent contends that petitioners have not established the worthlessness of the Unsecured Advances in 1984. Respondent further contends that there are facts and evidence that indicate that, in fact, the unsecured debt had substantial value in 1984. Respondent determined the values of petitioner's interests in MPW and in *116 Long Hill as follows: $ 380,000 Note from MPW to petitioner
$ 350,000  [1] or less   Petitioner's Equity in MPW
-0-  Petitioner's Cash Investment in
Long Hill 249,805
Unsecured Advances by Perlin
Company 494,101
$ 1,093,906
or less  Respondent points out that petitioner received $ 1,249,805 from Realtec for those claims and interests and that, even allowing for some reduction in the present value of the 10-year Contingent Note, petitioner clearly received from Realtec approximately the total amounts that he and Perlin Company invested in MPW and in Long Hill, including the Unsecured Advances. Petitioners argue that MPW's bankruptcy leads to the conclusion that petitioner had to accept Realtec's offer and that, as a result, the Unsecured Advances were not compensated for and were worthless in 1984. Petitioners contend that MPW's only significant asset was *117 the Property (the 1,400 acres of land) and its value was insufficient to repay all of MPW's outstanding debts. Petitioners further contend that petitioner did not see his or Perlin Company's claims as viable in a bankruptcy proceeding because there were no other potential purchasers willing to pay an amount for the Property that would be sufficient to pay all unsecured claims, including Perlin Company's $ 494,101 Unsecured Advances. Petitioners point out that Realtec's approach to MPW's bankruptcy was predicated upon being able to purchase or to acquire the Property at a price it felt it could afford. Petitioners assert that Realtec, thus, sought to negotiate a purchase of petitioner's interests in MPW and in Long Hill because it would be too expensive to proceed with the Modified Plan if Realtec were liable for paying all unsecured claims, the largest of which were the claims of petitioner and Perlin Company. Petitioners contend that petitioner agreed to the Realtec Agreement because he was concerned that, if he did not agree, Realtec would abandon efforts to obtain the Property and he would be left with a "potentially totally worthless investment". Thus, petitioner agreed not *118 to pursue his and his company's claims in the bankruptcy proceeding and accepted the Realtec Agreement with respect to his and Perlin Company's interests in and claims against MPW and Long Hill. Petitioners cite Williams v. McGowan, 152 F.2d 570 (2d Cir. 1945), [11] and section 1001(b) as "requiring an allocation of the fair market value of the consideration received from Realtec among the assets sold or assigned, in proportion to their respective fair market values". Yet, petitioners then argue that, if one attempts to allocate the purchase price paid by Realtec among petitioner's interests in MPW and in Long Hill, no amount was received for, or is allocable to, the Unsecured Advances. Petitioners present the report and testimony of Bonnie K. Wachtel (Wachtel) to bolster this argument.
*119 Wachtel's Report
Wachtel begins her report by recognizing that the Realtec Agreement encompasses the sale of petitioner's entire interest in MPW and in Long Hill. She also recognizes that Steadman, representing Realtec, and petitioner were engaged in arm's-length negotiations and that "to the extent that their own perceptions of value can be derived from the [Realtec Agreement], and such indications are economically credible, we have given them weight in determining [the] value" of petitioner's interests. Wachtel also sets forth her determination of the appropriate date of valuation: Date of Valuation: The Agreement was signed in June 1983, contemplating a closing at the time Realtec acquired the Property. This occurred approximately one year later. Because the parties anticipated an unspecified delay, we assume the Agreement reflects their estimate of the value of the consideration at the likely time of closing, and not simply on the day it was signed. In short, we are considering the parties' June 1983 determination of what certain property would be worth at the bankruptcy settlement, which occurred in 1984. Subject to this qualification, we have evenhandedly *120 used the 1984 date for our analysis as to consideration both received and surrendered.
A. Valuation of Consideration Received
In attempting to demonstrate the validity of petitioners' position, Wachtel first values the consideration received from Realtec. She determined that, in 1984, the fair market value of the total consideration received by petitioner in the sale of his interests to Realtec was $ 1,008,115. She assigned full value to the cash ($ 249,805), the second note ($ 250,000), and the third note ($ 250,000), for a total of $ 749,805. She then discounts the first note to $ 231,250 to reflect the lack of interest for 9 months. Wachtel then asserts that the 10-year Contingent Note either has no value or, at most, is valued at $ 27,060, to reflect the lack of interest for 5 years, the contingent nature of payment of both principal and interest, and its similarity to a venture capital investment. She thus values the total consideration received as $ 1,008,115. B. Valuation of Petitioner's Interests
Next, Wachtel values the interests surrendered by petitioner and Perlin Company. She treats the Realtec Agreement as having allocated between $ 250,000 and *121 $ 500,000 of the purchase price to the Georgetown Condominiums. She determines that petitioner ultimately disgorged $ 600,000 in sales contracts, deeds, and cash with respect to those condominiums to or for the benefit of Realtec. Therefore, she concludes that $ 500,000 of the maximum consideration of $ 1,008,115 is to be allocated first to the Georgetown Condominiums. Consequently, Wachtel concludes that the remaining $ 508,115 of consideration must be applied to discharge the First Trust Note or the Secured Note. Because the remaining consideration is insufficient to pay the full $ 630,000 face value of petitioner's percentage share of the First Trust Note or the Secured Note, Wachtel asserts that there is not any amount of the purchase price remaining to allocate to the Unsecured Advances. Court's Evaluation of Wachtel's Report
We think that Wachtel's valuations, allocations, and reasoning are flawed. First, she overvalues petitioner's indirect interest in the Georgetown Condominiums. See supra note 3. Then, she mixes apples and oranges when she compares petitioner's interest in Long Hill with his claims against MPW. Finally, we find that some allocation must *122 be made to the Unsecured Advances since the purpose of the Realtec Agreement was to compensate petitioner for all of his and Perlin Company's claims against MPW and his interest in Long Hill. In valuing each of the interests that petitioner sold to Realtec, we start with the premise that the goal of the Realtec Agreement was to return to petitioner all of the amounts of money he and Perlin Company had invested in MPW and in Long Hill. As stated, Steadman based his valuations of petitioner's interests and claims on the amounts petitioner initially invested in MPW and Long Hill. We have followed this approach as well. If this approach does not correspond with the true fair market values of petitioners' interests and claims, petitioners have not presented any credible evidence to the contrary. They have failed to demonstrate that their interests and claims had appreciated in value to an amount any greater than their initial investments and cash advances. A. The Georgetown Condominiums
Much of petitioner's argument and valuations are premised on an assumption that petitioner was the beneficial owner of the Georgetown Condominiums. However, that crucial fact is not established *123 by the record in this case or by the bankruptcy proceedings or by the then-pending litigation between Baker and petitioner. Baker always claimed that he owned the Georgetown Condominiums. See supra note 3. That ownership issue was never resolved either in the bankruptcy proceeding or in the collateral litigation. Petitioner has not proved that he ever owned the Georgetown Condominiums, although at some point he apparently held legal title and secured a mortgage to refinance the project. Petitioner was relieved of the liability for that mortgage when the condominiums were transferred back to Baker. On the record in this case, the Court concludes that petitioner's interest in the Georgetown Condominiums was an indirect one, resulting from MPW's default on the $ 380,000 Note. See supra note 3. In valuing that interest, we must consider that, at the time of default, the value of the $ 380,000 Note was something less than the $ 350,000 petitioner actually advanced, because Baker had already repaid part of that note. Steadman testified credibly that the condominiums served as a tool in Realtec's negotiations with Baker to obtain the Property. Thus, the condominiums, ultimately, *124 were to be returned to Baker, either by petitioner or through the bankruptcy proceedings and pending litigation. We find that the extent of petitioner's compensation for the disgorgement of his indirect interest in the Georgetown Condominiums as provided in the Realtec Agreement was based upon his direct interest in the $ 380,000 Note. That note had a value of something less than $ 350,000. The terms of the original 1977 Contract entered into by petitioner and Baker regarding the $ 380,000 Note provided that Baker had to consult with petitioner regarding sales of units and had to apply the proceeds he realized from any sales first to the deed of trust note on those condominiums and then to MPW's indebtedness to petitioner. When MPW defaulted on the $ 380,000 Note and the condominium units were transferred to petitioner, petitioner refinanced the mortgages on those units. When petitioner himself had to surrender the unsold units back to Baker and account for the units sold, petitioner was relieved of the corresponding mortgages. In addition, subsequent correspondence between Realtec and petitioner reveals that petitioner was compensated for additional expenditures that he had *125 had to make with respect to the condominiums. Thus, it appears that all those involved at the time treated petitioner's interest in the Georgetown Condominiums as a security interest in property to the extent necessary to cover the outstanding debt for which the property served as security. For petitioners and Wachtel now merely to state that petitioner disgorged a total of $ 600,000 with respect to the condominiums and, thus, that his interest was worth at least the $ 500,000 maximum provided in the Realtec Agreement does not properly address the issue of valuing the interest that he sold -- his interest in the $ 380,000 Note, as secured by the Georgetown Condominiums. Although they deny that the Realtec Agreement made specific allocations of the purchase price among petitioner's claims and interests, petitioners and Wachtel merely accept the offset provision's maximum figure of $ 500,000 as the value of petitioner's interest in the Georgetown Condominiums. [12] The evidence does not support this conclusion. *126 We conclude that Realtec did compensate petitioner for his indirect interest in the Georgetown Condominiums by compensating him for his interest in the $ 380,000 Note, at an amount less than $ 350,000. [13]
B. Petitioner's Interest in Long Hill
Throughout her analysis, Wachtel mistakenly refers to petitioner's interest in the First Trust Note or the Secured Note rather than petitioner's interest in Long Hill. In her report, Wachtel stated that, in valuing the "secured claim", she principally considered (1) the fact that the Secured Note was sold at 60 percent discount to face amount only 18 months earlier; (2) that two developers had failed in attempts to develop the Property; and (3) no serious bids had been obtained by MPW in *127 prior efforts to sell the Property. Despite these facts, she still equated one-half of the full face value of the Secured Note with the value of petitioner's interest in Long Hill. She then proceeded to assign all of what she determined to be the remaining purchase price ($ 508,115) to that interest. The value of petitioner's interest in Long Hill cannot be one-half of the face value of the First Trust Note or the Secured Note. Petitioner did not have a direct interest in the Secured Note: he had transferred that note to the Long Hill joint venture and retained an interest in that venture as a 50-percent partner. Furthermore, his indirect interest in the Secured Note was restricted: Realtec had the sole authority to make determinations regarding the collection of or foreclosure on the Secured Note. Considering that MPW was in default on the Secured Note at the time Long Hill acquired it, and that it was still unclear whether Long Hill would obtain the Property through the bankruptcy proceeding or otherwise, the face value of the Secured Note was not determinative of the value of petitioner's interest in Long Hill. Furthermore, at the time Long Hill purchased the Secured Note, *128 the Secured Note had a remaining principal balance of only $ 1,092,442.50. At the time of the Realtec Agreement, June of 1983, Steadman valued petitioner's interest in Long Hill as the amount petitioner initially invested as capital, plus the legal and accounting expenses that he had paid on behalf of Long Hill. Long Hill was formed in December of 1981, and its primary asset was a Secured Note purchased in an arm's-length transaction from Grubb & Ellis for just $ 400,000. There is no evidence that that note had appreciated in value by 1983. In March of 1982, MPW was in default on the Secured Note and filed for bankruptcy protection. As of June of 1983, MPW's situation had not markedly changed, and petitioners have presented no credible evidence to suggest that petitioner's interest in Long Hill had significantly appreciated to the equivalent of the Secured Note's face value. Thus, we conclude that Realtec purchased petitioner's interest in Long Hill at the amount agreed upon by Steadman and petitioner in an arm's-length transaction, namely, $ 249,805. C. The Unsecured Advances
Petitioners' argument that petitioner received no amount from Realtec for his company's claims *129 against MPW for the Unsecured Advances is not supported by the evidence. Steadman credibly testified that all of the interests and claims of petitioner and Perlin Company in MPW and in Long Hill were purchased by Realtec pursuant to the Realtec Agreement. [14] Steadman further testified that it was his intention to return to petitioner at least all of the initial amounts that petitioner and his company had invested in MPW and in Long Hill. Petitioner had the opportunity to, and did, negotiate better terms than Steadman's initial offer. He could have rejected Realtec's offer and continued to pursue his and Perlin Company's claims through the bankruptcy proceedings. Yet, he chose not to. Petitioner's subjective opinion and unsupported testimony, standing alone, that the claim for the Unsecured Advances would not be satisfied by the bankruptcy court and, thus, was worthless, is not sufficient. Petitioner and Perlin Company, as large creditors of MPW, could have taken a much more active role in the bankruptcy proceedings. They could have proposed an alternative bankruptcy plan. No showing has been made that such actions would have been futile. Although a taxpayer need not be "an *130 incorrigible optimist" with respect to the collection of a debt, United States v. S.S. White Dental Manufacturing Co., 274 U.S. 398, 403 (1927), we do not think that a taxpayer may substantiate the worthlessness of a debt based on his own pessimism and without showing that reasonable attempts to collect the debt would be futile.
It appears to this Court that petitioner, a long-time real estate developer in the Virginia Beach area, negotiated a satisfactory deal with Realtec. He would not have agreed to the Realtec Agreement and would have contested the treatment of his claims in the bankruptcy proceedings *131 if he felt he were not recouping at least what he had put into the project. Petitioner, in effect, guaranteed recovery of the amounts owed him by entering into the Realtec Agreement in 1983. If he did receive payment from the debtor's estate in the bankruptcy proceedings, Realtec (Ford's Colony) would reduce the amount it would pay to petitioner on a dollar-for-dollar basis. If he did not receive payment from the bankrupt's estate, he would continue to receive payments from Realtec (Ford's Colony) as provided in the Realtec Agreement. Conclusion
We hold that petitioners have not met their burden of proving that the Unsecured Advances were worthless in 1984. Thus, Perlin Company is not entitled to a bad debt deduction for that taxable year. By considering the language of the Realtec Agreement and the credible testimony of Steadman, we think it is clear that Realtec intended to compensate petitioner and Perlin Company for all of their claims against MPW, including the Unsecured Advances. The Realtec Agreement clearly provided that, if petitioner had received a distribution as either a creditor or shareholder of MPW, Realtec's obligation to pay petitioner for those interests *132 would have been reduced on a dollar-for-dollar basis. Thus, had the bankruptcy court rejected the Modified Plan and adopted another plan under which petitioner or Perlin Company received $ 494,101 as an unsecured creditor of MPW, Realtec would have deducted $ 494,101 from the amount owed under the Realtec Agreement. Similarly, had petitioner received only half of his claim in the bankruptcy proceeding, Realtec would have reduced its obligation by that amount while remaining obligated to pay the balance to petitioner. Thus, in effect, Ford's Colony, backed by Realtec's guarantee, intended to fully pay petitioner's claims. Steadman testified that this dollar-for-dollar reduction provision was included in the Realtec Agreement to protect Realtec from the lack of a formal assignment by petitioner and Perlin Company of their claims in bankruptcy against MPW. The evidence fails to support petitioners' argument that petitioner sold all of his claims and interests for a certain price but that none of that price is allocable to one of those claims or interests. Furthermore, unless and until Ford's Colony is shown to be unable to meet its obligation under the Contingent Note when it falls *133 due in 1994, the Contingent Note itself will not give rise to a bad debt deduction. Petitioner sold his claim for payment of the Unsecured Advances in the bankruptcy proceeding in return for obligations by Ford's Colony and Realtec to pay that amount. Thus, as of the signing of the Realtec Agreement in 1983, petitioner no longer had a claim against MPW, a bankrupt debtor, but against Ford's Colony, whose notes, except for the Contingent Note, were backed by Realtec's guarantee. Petitioners have not met their burden of proving that Ford's Colony or Realtec is, or will be, unable to meet these obligations. Therefore, petitioners cannot prove entitlement to a bad debt deduction in whole or in part in 1984. The Perlin Company's Unsecured Advances to the bankrupt debtor were replaced with guaranteed notes, except to the extent of the $ 250,000 Contingent Note. Petitioners cannot argue for a bad debt deduction in 1984 when the Contingent Note is not due until 1994, and no evidence has been presented that demonstrates that there is no reasonable hope of recovering that amount in 1994. II. Constructive Dividend
Respondent contends that, if we determine that Realtec in fact *134 compensated petitioner for the Perlin Company's Unsecured Advances pursuant to the Realtec Agreement, petitioner received a constructive dividend in the amount of $ 494,101 in 1984. Sections 301 and 316 provide that a distribution of property made by a corporation with respect to its stock is a taxable dividend to the extent of the corporation's earnings and profits.[15] Section 301(b)(1)(A) provides that the amount of the dividend is the amount of money plus the fair market value of other property received. A constructive dividend occurs when a stockholder receives an economic benefit from the corporation, or rightfully belonging to the corporation, without expectation of repayment. Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306. Petitioners concede that, if we determine that a portion of the purchase *135 price paid to petitioner pursuant to the Realtec Agreement was in payment of Perlin Company's Unsecured Advances, petitioner has received a constructive dividend. However, petitioners dispute that the constructive dividend received in 1984 was the full amount of $ 494,101. In addition, petitioners assert that any amount determined to be a constructive dividend is one of a series of liquidating distributions. The amounts received by petitioners from Realtec pursuant to the Realtec Agreement and the amount received by petitioner as a constructive dividend from Perlin Company are two separate inquiries. Petitioner received a $ 494,101 constructive dividend from Perlin Company in 1984 because the company, in effect, distributed the benefit of its claim for the Unsecured Advances against the debtor to petitioner as a dividend without expectation of repayment. [16] We sustain respondent's determination that the amount of the constructive dividend is $ 494,101. Petitioners bear the burden of proving that Perlin Company's $ 494,101 claim against MPW was not worth its full face value, and they have not done so. Realtec intended for petitioner to receive the amounts remaining due upon *136 his and Perlin Company's claims against MPW, either through the purchase price to be paid pursuant to the Realtec Agreement or, alternatively, through a distribution in bankruptcy. The Modified Plan provided that all unsecured creditors, into which category the claims of petitioner and his Perlin Company fell, would be paid in full. *137 Our determination that petitioner received a constructive dividend from Perlin Company in 1984 in the amount of $ 494,101 is a separate issue from whether or not petitioner sold that claim to Realtec for $ 494,101. [17] Furthermore, an inquiry into whether or not Realtec and petitioner intended for the Contingent Note to be allocated to the purchase of the claim for the Unsecured Advances is irrelevant to the determination of whether or not petitioner received a constructive dividend from his company. Petitioner received a benefit, valued at $ 494,101, from his company that he was not expected to repay. In effect, Perlin Company's claim for the Unsecured Advances against the debtor became another of petitioner's individual claims against the debtor. Petitioner then chose to negotiate a sale of all of these claims to Realtec. Two separate transactions occurred and, accordingly, they must be treated as such. *138 We cannot sustain petitioners' contention that any dividend received by petitioner in 1984 was part of a series of distributions in redemption of all of the stock of the Perlin Company pursuant to a plan of liquidation. [18] Petitioners' reliance on Fowler Hosiery Co. v. Commissioner, 36 T.C. 201 (1961), affd. 301 F.2d 394 (7th Cir. 1962), does not help petitioner. In that case, we held that it is not necessary for a corporation to adopt a formal plan of liquidation in order to qualify under section 346. We found that it is sufficient if the corporation formally or informally adopts a plan which in effect constitutes a plan of complete liquidation. The corporation in Fowler Hosiery had entered into a contract for the sale of its assets, agreed it would not engage in business activity of a nature similar to that in which it had previously engaged, agreed to encourage its employees to become employees of the purchasing corporation, and agreed to turn over to the purchasing corporation all information with respect to its operations. We held that under those facts the corporation had adopted what was in effect a plan for *139 liquidation. The Perlin Company did not adopt a liquidation plan until 1985. Petitioner's unsupported testimony that he accepted no new contracts in 1984 does not rise to the level of an informal plan of liquidation. Petitioner himself testified that he did not begin to "wind down" the operations of Perlin Company until 1985. Petitioners have not presented any evidence establishing that, in 1984, the company had taken any actions, formal or informal, constituting a plan of liquidation. As a result, petitioners' constructive dividend is not eligible for treatment as a distribution in redemption of stock as provided in sections 346 and 331. III. Installment Sale and the Price-Interest Recomputation Rule
On their 1984 tax return, the individual petitioners reported the purchase price received pursuant to the Realtec Agreement as $ 1,249,805, which consisted *140 of $ 499,805 cash received in 1984, the second note, the third note, and the Contingent Note, each having a face value of $ 250,000. This transaction qualified for installment sale treatment. An installment sale is a disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition occurs. Sec. 453(b)(1). If a disposition qualifies as an installment sale, the installment method of accounting permits a taxpayer to defer recognition of gain (profit) on the disposition until the taxpayer actually receives the money. Thus, under the installment method, the taxpayer is able to recognize the gain on the installment sale over the period during which the installment payments are received, rather than be taxed on all of the gain in the year of sale. Each payment received in an installment sale is treated in part as a nontaxable recovery of a portion of the taxpayer's basis in the property, and in part as a taxable realization of a portion of the taxpayer's gain upon disposition. Sec. 453(c). The amount of each payment that must be reported as gain is determined by multiplying the total amount of payments received during *141 the year by the gross profit percentage. Sec. 453(c). The gross profit percentage is the ratio of the gross profit (the selling price less the taxpayer's adjusted basis) to the total contract price (the selling price reduced by any qualifying indebtedness assumed or taken subject to by the buyer). Sec. 453(c). The installment method of reporting gain also applies to sales with a contingent selling price. A contingent payment sale is defined as a sale or other disposition of property in which the aggregate selling price cannot be determined by the close of the taxable year in which the sale or disposition occurs. Sec. 15A.453-1(c)(1), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981). Regulations provide rules for ratable basis recovery in transactions where the gross profit or the total contract price (or both) cannot be readily ascertained. Sec. 453(j)(2); sec. 15A.453-1(c), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981). The regulations also provide special rules for determining gain from contingent payment sales and for allocating the taxpayer's basis to payments received and to be received. *142 The temporary regulations address three different contingent sale situations: (1) sales for which a maximum selling price is determinable, sec. 15A.453-1(c)(2), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981); (2) sales for which a maximum selling price is not determinable but the time over which payments will be received is determinable, sec. 15A.453-1(c)(3), Temporary Income Tax Regs., 46 Fed. Reg. 10714 (Feb. 4, 1981); and (3) sales for which neither a maximum selling price nor a definite payment term is determinable, sec. 15A.453-1(c)(4), Temporary Income Tax Regs., 46 Fed. Reg. 10715 (Feb. 4, 1981). See also sec. 453(d). The situation in this case falls within section 15A.453-1(c)(2), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981). Under section 15A.453-1(c)(2)(i)(A), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981), "The stated maximum selling price shall be determined by assuming that all of the contingencies contemplated by the agreement are met or otherwise resolved in a manner that will maximize *143 the selling price and accelerate payments to the earliest date or dates permitted under the agreement." In computing the maximum selling price under section 15A.453-1(c)(2)(i)(A), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981), petitioners argue that the face value of the Contingent Note should be reduced to reflect the "internal interest" amount of the note. Petitioners now contend that the $ 250,000 Contingent Note should have been reported as $ 94,223 as a result of the applicability of the price-interest recomputation rule of section 15A.453-1(c)(2)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981). [19] *144 Respondent, on the other hand, has determined that the full face value of the note should be included in the computation of the maximum selling price in the year of sale due to Ford's Colony's right to prepay, at any time, the entire amount of the Contingent Note. [20]
We do not sustain respondent's interpretation of the operation of section 15A.453-1(c)(2)(i)(A), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981). We do not think that the prepayment provision of the Contingent Note is a "contingency" as contemplated under section 15A.453-1(c)(2)(i)(A), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981). A "contingency" exists when the enforceability of a right to the payment of an obligation depends upon the occurrence of some future event which may or may not occur. In this case, for example, petitioner's right to enforce the obligation of Ford's Colony to pay $ 250,000 is contingent upon Ford's Colony's earning a certain level of profits, which may or may not occur. The prepayment clause, however, does not represent an event, the occurrence of which would give rise to an enforceable obligation. Petitioner cannot force Ford's Colony to prepay the *145 Contingent Note. If Ford's Colony were to decide to prepay the Contingent Note, that prepayment would itself satisfy the obligation. Therefore, a prepayment cannot be viewed as a "contingency", the occurrence of which would give petitioner an enforceable right to payment. Given the foregoing, we think it is appropriate to assign the resultant calculations to the parties to be made pursuant to the Rule 155 computation. To reflect the above holdings, Decisions will be entered under Rule 155
Footnotes
1. Tidewater Green Enterprises owned 29 condominium apartments known as the "Georgetown Condominiums", located in Hampton, Virginia. Paragraph 4 of the Contract provided that Baker could offer individual units for sale in furtherance of the Plan of Cooperative Organization dated November 1, 1977, provided that such sales were approved by petitioner and that all proceeds realized from such sales were applied first to payment of a deed of trust note in the original sum of $ 495,000 and second to the indebtedness of MPW to petitioner to the extent of Baker's interest in Tidewater.↩
2. The parties stipulated that on January 30, 1981, petitioner obtained a $ 725,000 first mortgage loan "to finance the acquisition of 29 condominiums (the Georgetown Condominiums)." If this was intended as a legal conclusion that petitioner purchased the Georgetown Condominiums outright, the Court rejects the stipulation. Petitioner himself testified he acquired the condominiums because of MPW's default, and that he thereafter refinanced the project. The litigation between Baker and petitioner was later dismissed as part of the overall settlement of the MPW bankruptcy case, without resolution of the issues as to who was the beneficial owner of the Georgetown Condominiums. To the extent that petitioner claims that he owned the Georgetown Condominiums outright, he has not established that fact on the record in this case.↩
3. Petitioner actually advanced the $ 400,000 to purchase the First Trust Note from Grubb & Ellis. He then transferred the First Trust Note to Long Hill, and was then reimbursed $ 200,000, so that each joint venturer paid $ 200,000 for a 50-percent interest in Long Hill and indirectly a 50-percent interest in the note.↩
4. The LHP Agreement states that Realtec has this sole authority based on Realtec's expertise and experience in the real estate industry and on the fact that petitioner was participating in the venture for investment purposes only.↩
5. After MPW filed for bankruptcy, Perlin Company charged off the $ 494,101 Unsecured Advances on its books for its fiscal year ended May 31, 1982, and reported the charged-off amount as a bad debt deduction on its corporate Federal income tax return for its fiscal year 1982. Upon subsequent audit of the 1982 return, respondent verified the amount of the advances but disallowed the deduction "until the final disposition of the related court matters". As a result of the disallowance, Perlin Company paid the tax due with respect to the disallowed bad debt deduction, plus interest.↩
6. These amounts add up to $ 1,139,963.90, so presumably at least $ 317,000 of that amount had already been paid, to bring the total claim figure down to $ 822,963.93. What is clear is that the bankruptcy claim included all of the claims of both petitioner and Perlin Company. In the final Stipulation of Settlement in the bankruptcy proceeding, petitioner was referred to as "Perlin" and the Leon H. Perlin Company, Inc., was described as a company owned by "Perlin" and "included within 'Perlin'".↩
7. Realtec used the Georgetown Condominiums as a negotiating tool to ultimately settle the bankruptcy proceedings. Some units were returned to Baker and some units to his attorneys. Title was never in Realtec's name, but Realtec "controlled their disposition".↩
8. Pursuant to a Stipulation of Settlement and Resolution of All Outstanding Matters entered on July 25, 1985, by the United States Bankruptcy Court for the Eastern District of Virginia (the Stipulation of Settlement), petitioner and Mrs. Perlin assigned, transferred, sold, and set over to Cheryl Baker, as assignee of Hab Baker, all of their right, title, and interest in and to secured notes and contracts for sale, or cash from the sale, of eight units at the Georgetown Condominiums. On August 2, 1985, petitioner and Mrs. Perlin deeded five units of the Georgetown Condominiums to Montague, Montague, and Long, the Bakers' legal counsel. In addition, petitioner transferred $ 53,131, representing the gross proceeds (less closing costs and commissions but not mortgage indebtedness) from the sale of unit 2F to Montague, Montague, and Long. Petitioner also assigned his stock interest in MPW to Cheryl Baker.↩
9. When Steadman's initial offer and the final Realtec Agreement are compared, the amount of the Contingent Note was increased from $ 175,000 to $ 250,000. The initial offer represented the total amount that Steadman considered petitioner initially to have invested in the project. Steadman agreed to the increase in the face amount of the Contingent Note because, if the project were successful, petitioner should share in the success and would be entitled to additional compensation above reimbursement of his initial investment. The contingent nature of the note was designed to spread the risk of failure.↩
10. The record does not specifically show the then outstanding balance of the $ 380,000 Note. The $ 380,000 Note had been partially paid off by Baker. At the time of the trial, petitioner could not remember how much had been repaid, but there is an indication that over $ 100,000 had been repaid.↩
1. The actual loan was $ 350,000, but the face amount of the note was $ 380,000, some part of which (possibly over $ 100,000) had been repaid.↩
11. Williams v. McGowan, 152 F.2d 570↩ (2d Cir. 1945), holds that the sale of a hardware business as a going concern should not be treated as a single piece of property representing a "capital asset", but rather should be divided into its components, each of which would then be separately matched against the statutory definition of capital asset. Although Williams does not specifically require that an allocation of purchase price be based upon fair market value of the assets sold, such a requirement is generally recognized.
12. Even if petitioner's interest were in the Georgetown Condominiums, Wachtel's analysis leaves much to be desired. Wachtel made no independent attempt to determine the 1984 values of the condominiums. Although she noted that the units in question were sold from 1981 to 1985, she did not perform the same present value analysis and discounting that she did in determining the value of the consideration received by petitioner. She never saw the apartments and erroneously assumed they were located in Washington, D.C. In fact she did not purport to determine the fair market value of those condominiums. Essentially, she tried to support the legal interpretation of the Realtec Agreement advanced by petitioners' counsel. She merely adopted the numbers and analysis provided by petitioners' counsel.↩
13. It is not necessary for us to determine the exact value of petitioner's interest in the $ 380,000 Note because there is sufficient consideration provided in the Realtec Agreement to compensate petitioner for all of the interests and claims that he and his company sold to Realtec.↩
14. It is important to note that part of petitioner's interest in Long Hill included the future joint venture's obligation, if it acquired the Property, to pay off MPW's debts to petitioner, which included the Unsecured Advances. This obligation further supports our conclusion that Realtec intended to, and did, repay to petitioner the Unsecured Advances made by his company to MPW.↩
15. It has not been suggested that Perlin Company did not have sufficient earnings and profits for this purpose.↩
16. It could be argued that petitioner received the constructive dividend in 1983 before he entered into negotiations with Realtec. Petitioner could not have negotiated the transfer to Realtec of all of his and his company's claims against debtor if the Perlin Company had not already in effect conferred the benefit of the claim for the Unsecured Advances on petitioner with no expectation of repayment. However, since both parties agree that the Realtec Agreement did not become effective until Realtec acquired the Property, which occurred in 1984, and that all of the events bringing about these transfers of claims and interests and the payments therefor did not occur until 1984, we find that the constructive dividend, as well, was received by petitioner in 1984.↩
17. Petitioners argue that the amount of any constructive dividend determined to have been received by petitioner in cash would reduce the payment received by petitioner on the sale of his interests for purposes of installment reporting under sec. 453. We do not agree. Any constructive dividend received by petitioner represents a transaction between himself and his company. Any sales proceeds received by petitioner for his sale of his interests represents a transaction between himself and Realtec. These transactions are separate and must be treated as such.↩
18. Under secs. 346(a) and 331(a), any such distribution would be treated as in exchange for stock and would be eligible for capital gain treatment.↩
19. Petitioners argue that sec. 15A.453-1(c)(2)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981), provides that, where sec. 483 is applicable, the stated maximum selling price shall be reduced by "internal interest", the total unstated interest as determined under sec. 483 (the price-interest recomputation rule). The Contingent Note does not provide for interest for the first 5 years and provides for contingent interest for the next 5 years until maturity. Under sec. 1.483-1(e)(2), Income Tax Regs., contingent interest is not taken into account for purposes of sec. 483 until it is actually paid. Petitioners argue, therefore, that the Contingent Note must be discounted without regard to any of the contingent interest payments. Petitioners conclude that the maximum selling price of the Contingent Note should be $ 94,223. Under sec. 1.483-1(g)(2)↩, Table VII(b), Income Tax Regs., the discount factor is .37689. This figure represents the present value of $ 1 at 10 percent compounded semiannually on an investment return deferred for more than 117 months but less than 123 months. Thus, $ 250,000 multiplied by the discount factor equals a "selling price" of $ 94,223, according to petitioners' argument and calculations.
20. The $ 250,000 Contingent Note provides that it may be prepaid, in whole or in part, at any time without penalty. [Exh. 14-N, p.8]↩